811 So.2d 1172 (2002)
STATE of Louisiana
v.
Todd PLAISANCE, a/k/a Michael Thomas.
No. 2000-KA-1858.
Court of Appeal of Louisiana, Fourth Circuit.
March 6, 2002.
Rehearing Denied April 16, 2002.
*1177 Harry F. Connick, District Attorney, Leslie Parker Tullier, Assistant District Attorney, Orleans Parish, New Orleans, LA, for Plaintiff-Appellee.
Timothy R. Saviello, Harold P. Ducloux, New Orleans, LA, for Defendant-Appellant.
Court Composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS, SR., and Judge MAX N. TOBIAS, JR.
*1178 MAX N. TOBIAS, JR., Judge.
The defendant, Todd "Tiger" Plaisance ("Plaisance"), was charged by grand jury indictment with first degree murder, a violation of La. R.S. 14:30. Following a trial, a twelve member jury found him guilty of second degree murder, a violation of La. R.S. 14:30.1. The trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant appeals his conviction.

FACTS
New Orleans Police Officer Timothy Melerine testified that on the evening of 18 January 1999, he responded to a call of a man down in the 2700 block of North Peters Street. He discovered the body of a man, later identified as George Hood, who had a wound to the right temple.
New Orleans Police Homicide Detective Greg Hamilton investigated the murder of George Hood. Detective Hamilton went to Charity Hospital, but Mr. Hood, unidentified at that time, never regained consciousness before he died the next morning. Mr. Hood, a nurse who was scheduled to work that day at Charity Hospital, was identified by a fellow nurse on duty. Detective Hamilton subsequently learned that the defendant, Plaisance, was the last person to be with the victim. Mr. Hood's roommate assisted Detective Hamilton in locating Mr. Hood's vehicle; it was eventually found parked at the corner of North Rampart Street and Orleans Avenue. Detective Hamilton later recovered the keys to Mr. Hood's vehicle from inside one of his shoes, found in a drain near that location. He enlisted the assistance of the New Orleans Sewerage & Water Board to recover those items. The other shoe was recovered at the scene of the murder, where Mr. Hood's body was found. The murder weapon, a .22 caliber revolver, was discovered underneath the seat of the victim's vehicle. Police arranged through the defendant's girlfriend, Lori Sprouse ("Sprouse"), to have the defendant turn himself in at the Schwegmann's Super Market parking lot on North Broad and Bienville Streets. Plaisance was taken into custody six to seven hours after the shooting was reported. The defendant gave a statement to New Orleans Police Detectives Arthur Kaufman and Frank Polito, informing them that the keys to Mr. Hood's vehicle were inside one of the his shoes in the drain, and that the gun was underneath the seat of the victim's car. Detective Hamilton took a statement from Sprouse. The victim resided at 1040 Louisa Street.
At trial, Detective Hamilton stated on cross examination that he was first notified of the crime at 6:50 p.m., but the investigation was already in progress. Detectives Kaufman and Polito were already at Sprouse's residence when Detective Hamilton arrived. Sprouse accompanied Detectives Kaufman and Polito to the Schwegmann's parking lot where Detective Hamilton said the defendant turned himself in without incident. After Plaisance gave his statement to Detectives Kaufman and Polito at the Fifth District police station, Detective Hamilton transported him to Central Lockup. Detective Hamilton said the defendant began talking. As he drove the defendant down North Rampart Street, Plaisance offered to show him the drain where the keys to the victim's vehicle were located. Detective Hamilton said he retrieved the gun, a revolver, from exactly where the defendant told him it would be in the victim's vehicle.
Detective Hamilton was shown the unloaded revolver, and was asked by defense *1179 counsel to pull the trigger. It would not fire. Detective Hamilton agreed that simply pulling the trigger of the revolver, in the condition it was in at that time, would not make it fire. Detective Hamilton was then asked to cock the revolver, which he did. He then was able to pull the trigger and cause the hammer to fall forward. He agreed that if the gun had been loaded, the hammer would have struck the internal firing pin, which in turn would have struck the cartridge and sent a bullet on its way. Detective Hamilton agreed that from what he observed, it appeared that the revolver would not fire unless the hammer was cocked. Detective Hamilton was asked to pull the trigger, and attempt to cock the hammer. The hammer would pull back, but would not lock into place. However, when the hammer was released, it snapped forward. Based on this demonstration, Detective Hamilton agreed that gun would also fire if, while pulling on the trigger, one pulled the hammer back and let it snap forward.
Detective Hamilton confirmed that the information the defendant told police about the alleged crime was truethat the victim was on his way to work; that the defendant was staying at the victim's residence; that the shooting happened in the victim's vehicle, a new Saturn automobile; that the victim had been seated in the driver's seat and the defendant in the passenger seat; that the gun was a .22 caliber revolver; that one shot was fired; that the gun contained one live round and one spent round; that the defendant parked the vehicle on North Rampart Street and placed the keys down a particular drain near the vehicle; and other information. Detective Hamilton also confirmed that Plaisance said he refused to have sex with the victim, that the two men struggled over the gun, and that the gun went off during the struggle and the bullet struck the victim.
Detective Hamilton stated on cross examination that the defendant said that after the victim was shot, he drove off in the victim's vehicle and went to two French Quarter bars that catered to homosexuals, the Double Play and the Round Up. Detective Hamilton said Plaisance told him that at one time he worked as a bouncer at the Round Up. Detective Hamilton testified that at the time the defendant gave his statement, he was only facing an attempted murder charge, as the victim had not died. The detective said he later learned that the defendant was about to be kicked out of the victim's residence. He did not recall whether Plaisance had admitted this to him. Detective Hamilton recalled that the defendant told him that the victim had voluntarily lent him his vehicle prior to the day of the shooting. He later learned during his investigation that the defendant's statement as to this fact might not have been true, but said he could not prove it.
James Traylor, M.D., who was qualified by stipulation as an expert in the field of forensic pathology, conducted the autopsy of the victim, a forty-three year old white male, 5'11" tall, weighing 268 pounds. The victim tested negative for alcohol or commonly abused drugs. The cause of death was a single, close contact gunshot wound penetrating the right front side of the victim's head with craniocerebral injury. The bullet traveled to the left side of the head. Dr. Traylor described the gunshot wound as a "close contact" wound, made with the muzzle of the gun no more than six inches away. Dr. Traylor opined that the distance was probably closer to one to three inches than six inches. The only other injuries noted on the body were *1180 two abrasions, one to the upper forehead and one on the left cheek below the eye. Dr. Traylor confirmed that the abrasions would be consistent with someone falling a short distance to the ground and hitting one's head. He said he found no signs of a struggle, and the victim's hands contained no injuries or gunpowder burns. Dr. Traylor concluded that it was unlikely the gun went off accidentally, but conceded that anything was possible. He, personally, found it hard to believe that a weapon would discharge accidentally one to three inches from someone's head. Dr. Traylor opined that the gunshot would have rendered the victim immediately unconscious due to the brain injury, and indicated that it would have been impossible for the victim to remove his seatbelt, open the door, and exit the vehicle before collapsing.
Dr. Traylor admitted on cross examination that he did not take evidence from the victim's hands for gunpowder residue analysis. He noted that he saw no visible soot on the hands, but confirmed that gunpowder residue can be invisible to the naked eye. Dr. Traylor also said that it was possible, in view of the soot pattern deposits on the victim's head, to test fire a gun to determine the distance from the barrel to the point of impact. He said that, to his knowledge, that was not done in the instant case. Dr. Traylor confirmed that one could be involved in a struggle and not sustain any wounds.
New Orleans Police Crime Lab Officer Byron Winbush was qualified by stipulation as an expert in the field of ballistics and firearms examination. He stated that the .22 caliber revolver introduced in evidence was "single action," meaning that one had to manually cock the hammer to fire it. Once cocked, the trigger required 4.5 pounds of pressure for discharge. Officer Winbush said the .22 caliber revolver had fired the bullet recovered from the victim's head during the autopsy.
Billy Neal ("Neal") testified that the victim, his best friend for twenty-three years, was like his brother. Neal had met Plaisance in the Double Play in the French Quarter, where the defendant worked as a bouncer. Neal said Plaisance had been living with the victim. He last saw the defendant at the victim's home on the Sunday morning before the murder. Neal was present when the victim told the defendant that he had to move out, because the defendant had used the victim's car without permission on Saturday night. Neal last spoke to the victim at 6:15 p.m. on Monday evening. The victim was supposed to be at work at 7:00 p.m. Plaisance was supposed move out Tuesday morning. Neal later telephoned the victim's residence, and a police officer answered. He went to the victim's residence at the invitation of police. Officers there escorted him to Charity Hospital. While driving to the hospital, Neal noticed the victim's vehicle parked at Orleans Avenue and North Rampart Street. Neal said that he used to own a gun, but removed it from his home at the victim's request; the victim became terrified at the sight of the gun, and began shaking. Neal described the victim as a "couch potato," who had gained substantial weight after having had a brain tumor removed twelve years earlier. Neal said it was not unusual for the victim to have people staying at his home. When asked whether the victim demanded sex from any of these people, Neal responded in the negative. He was asked whether he had personal knowledge of the victim having sex with any of these people, and Neal again replied in the negative. Neal stated that he had seen the defendant, while working as a bouncer, get physical and *1181 remove people from the Double Play bar. Neal described some of the ejected persons as larger than himself; he said he weighed 290 pounds.
Detective Kaufman testified that he and Detective Polito went to the victim's residence after learning his identity. James Dunbar, the victim's roommate, was there. They drove him to the hospital. Along the way, they discovered the victim's vehicle; the vehicle was impounded for safekeeping. The detectives subsequently received a telephone call from Sprouse. They met with her at a residence on South Lopez Street. She paged Plaisance, and he arranged to turn himself in to the police. Detective Kaufman noticed no signs of injury on the defendant during the couple of hours that the defendant was in the Fifth District Investigative Unit Office. Plaisance was advised of his rights and gave a taped statement. Detective Kaufman identified the tape, and it was played for the jury.
Plaisance said in his statement that he had smoked a "joint" before turning himself in to the police. He said that as of the evening of the shooting, he had been staying with the victim for a couple of weeks. The victim left his residence to go to work, and was giving him a ride to the French Quarter, where the defendant planned to sell his gun. As they drove, the victim allegedly said he wanted to talk to the defendant. The victim drove to the location of the shooting and parked. Plaisance said the victim asked him whether he thought he should get something from him in exchange for letting him stay with him. Plaisance asked what, and the victim allegedly said he wanted some "dick." The defendant said he reminded the victim that the victim had told him he would not ask him for sex. The victim allegedly said that he had changed his mind. Plaisance declined. The defendant said the gun was sitting on the gearshift console. It was loaded with two cartridges. He said that when he declined to have sex with the victim, the victim reached down. Plaisance thought the victim was going to grab the gun, so he grabbed it first. The victim then grabbed his hand and told him to let the gun go. The two wrestled. Plaisance said the gun was cocked and it went off, striking the victim. The victim then opened the door and fell partially out of the vehicle to the ground. He said he pushed the victim out of the vehicle, exited the passenger side, walked around to the driver's side, stepped over the victim and into the driver's seat, and drove off. He parked the vehicle on North Rampart Street and went to the Round Up. The defendant said that he dropped the gun in the vehicle after it went off. He told the detectives that the gun was still in the vehicle, under the driver's seat. He also told them he threw the keys down a drain.
Plaisance said the victim's roommate paged him. When he telephoned the roommate back, he told the roommate that the police were at the victim's residence, and he asked what was wrong. The roommate said he did not know because he was not there. He said that the roommate wanted to meet him at the Double Play. Plaisance said he went to his residence and told his wife what happened. His wife received a call from her friend, who said the police were looking for him. He said he then fled. Plaisance said he met the victim ten years earlier, in 1989, and would see him every now and then at the Double Play and Round Up. He further said that he had never had an argument with the victim before the shooting incident. He said he had no problems with the victim insofar as staying with him, and that he *1182 got along with the victim and the other person there. The defendant concluded by stating that he had not tried to kill the victim, and that he hoped the victim would not die.
Detective Kaufman testified on cross examination that when he arrived at 641 South Lopez Street, he recognized Sprouse as a familiar face from his days working in the French Quarter; her father used to work on Bourbon Street. She told him that the defendant had contacted her and said he wanted to turn himself in to the police. Detective Kaufman reiterated that Plaisance was cooperative from the moment he was taken into custody through the giving of his statement. However, the detective said on redirect examination that he later learned that the defendant's statement that the victim had previously permitted him to use his vehicle was false.
Sprouse described the defendant as her fiancé and the father of one of her four children. She said that the defendant knocked on her door at 4:00 a.m. on the morning of 18 January 1999. He came in, put a gun on the bed, and covered it with a pillow. He subsequently left, telling her that he would come back later that day. Sprouse later stated on cross examination that the defendant had gone around the house and kissed all of the children before leaving, and that he took the gun with him when he left. Plaisance woke her up again between 10:00 and 10:30 p.m. that night. He came in, sat on the bed, and asked if "it" had been on the news yet. He said: "Oh, my God. I can't believe I shot someone." She said he was very upset and scared. The defendant went across the street to make a telephone call. Sprouse received a telephone call while he was away. Plaisance returned, told her that he wanted to turn himself in, and would call her to arrange the details. He then left. Sprouse subsequently made the arrangements, and the defendant turned himself in to the police. She was at the police station when the officers took Plaisance away after he made a statement. She testified that the defendant was a wreck, crying hysterically, and shaking. She said he was a wreck for the next three nights.
On cross examination, Sprouse testified that she worked at the Mile High Bar, across the street from the courthouse. She said the defendant had been living with her, but indicated that he was not living with her at the time of the shooting. Sprouse said that the defendant had been staying in the Ninth Ward with a friend for about two weeks. She said they talked almost every day. She knew he worked in a gay bar, and said that was where she had met him. When the defendant left her home early on the morning of the shooting, he was driving a black vehicle. She said it looked like the one in a photograph of the victim's vehicle. Sprouse was asked when it was that the defendant had told her that the victim had attempted to rape him. She replied that it either had been at the police station or during his first telephone call to her, apparently referring to a post-incarceration call that was received before she gave her statement to police. Sprouse reviewed the statement that she gave to police, and confirmed that nowhere in it did she refer to the defendant acting in self-defense. She said she just assumed that no one would think that the defendant had intentionally done it.
Ellis Bridges ("Bridges") testified that Plaisance was his friend, and that he had known him for three to four years. Plaisance came to his residence at 325 North Roman Street between 10:00 p.m. and *1183 12:00 a.m. on the night of 18 January 1999. He asked to use the telephone, and said something had happened. Bridges said he could tell something had happened; the defendant's eyes were watery. He believed the defendant telephoned Sprouse. When the defendant hung up, he told Bridges that he had accidentally shot someone. He said the defendant did not give him any specific details, but he recalled the defendant saying something about "he went for the gun or something like that." The defendant called Sprouse a second time, and Bridges heard him talking to her about it being an accident, and about turning himself in to the police. After the last conversation, the defendant smoked some marijuana. Bridges walked the defendant to the corner of Bienville Street, and defendant walked towards Schwegmann's.
Bridges said he had never spoken with the police. He thought it was too late, as they had already spoken to Sprouse. He said he also did not think it would help the defendant. He testified that the defendant had no scratches or bruises on him, and that none of the defendant's clothing was torn.

ERRORS PATENT
A review of the record reveals one error patent. The record does not reflect that Plaisance was arraigned. La.C.Cr.P. art. 555 provides that an error in failing to arraign a defendant is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.

ASSIGNMENTS OF ERROR
On appeal, the defendant raises ten assignments of error. We first consider his claim, raised in his second assignment of error, that the evidence is insufficient to support his conviction.
This court has set out in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, the well-settled standard for reviewing convictions for sufficiency of the evidence. It is:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from *1184 which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011, 744 So.2d at 106-107, quoting State v. Egana, 97-0318 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Plaisance was convicted of second degree murder, defined in pertinent part by La. R.S. 14:30.1 as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, or when the offender is engaged in the perpetration or attempted perpetration of, among other felonies, armed robbery or simple robbery. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Hebert, XXXX-XXXX (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050. Specific intent can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382, 390.
The defendant concedes that based on his statements to Sprouse, Bridges, and the police ample evidence exists from which the jury could have concluded that he was "involved" in the killing. He argues, however, that the evidence was insufficient to establish beyond a reasonable doubt that he had the specific intent to kill the victim. He argues that the evidence did not exclude every reasonable hypothesis of innocence, i.e., the gun discharged accidentally. Also, he argues that he may not be convicted solely on his own uncorroborated custodial statement because it contains no evidence of a crime.
In State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, the court discussed the corroboration rule:
Under the Louisiana corpus delicti rule, an accused cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. State v. Cruz, 455 So.2d 1351 (La.1984). The prosecution, in order to establish guilt, must show that the injury specified in the crime occurred and that the injury was caused by someone's criminal activity. 1 McCormick, Evidence § 145 (John W. Strong ed., 4th ed.1992). The touchstone is trustworthiness-an untrustworthy confession should not alone support a conviction, and corroboration is an effective test of the trustworthiness of a person's inculpatory statements.
* * *
[T]he Louisiana corpus delicti rule,... only requires corroboration of the reliability of an inculpatory statement. The rule should not be extended to add a requirement that independent evidence corroborate every element of the crime admitted in the accused's statement, the general reliability of which has been corroborated. Corroborating evidence need only show the essential *1185 injury involved in the charged crime (e.g., death caused by criminal activity in a murder charge) in order to establish the reliability of the inculpatory statements of the accused; the corroborating evidence need not show every element in the definition of the charged crime (e.g., the predicate felony in a felony murder).
93-0285, 645 So.2d at 195-196.
La. R.S. 14:29, relevant to homicide, provides:
Homicide is the killing of a human being by the act, procurement, or culpable omission of another. Criminal homicide is of five grades:
(1) First degree murder.
(2) Second degree murder.
(3) Manslaughter.
(4) Negligent homicide.
(5) Vehicular homicide.
In his statement to the police, Plaisance said that the victim had allowed him to use the victim's vehicle two nights before the shooting to go to Sprouse's residence to get the gun, which he wanted to sell. On the day of the shooting, he asked the victim for a ride to the French Quarter so he could sell the gun. The two of them were riding in the victim's vehicle with the loaded gun placed on the gearshift console. After the defendant rejected the victim's request for sex, the victim made a move that the defendant interpreted as a grab for the gun. The defendant grabbed it first. As Plaisance held the gun, which was cocked, the victim grabbed his hand. They wrestled and the gun discharged, striking the victim in the head. The defendant pushed the victim out of the vehicle and drove off. He left the vehicle on North Rampart Street with the gun under the driver's seat.
Testimony from Dr. Traylor and Office Winbush establishing that the victim died from a close contact gun shot wound to the head, which came from the .22 caliber revolver found in the victim's vehicle, in addition to the testimony from Detective Hamilton that the vehicle and gun were found on North Rampart Street, constituted adequate independent corroborative evidence of the reliability of the defendant's statement that a criminal homicide, as defined by La. R.S. 14:29, was committed, thereby satisfying Louisiana's requirement for testing the reliability of an accused's inculpatory statement.
Furthermore, we conclude that from the defendant's own statement, in addition to the testimony from Dr. Traylor, Officer Winbush, Detective Kaufman, Detective Hamilton, and Neal, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the defendant shot the victim in the head while having the specific intent to kill or inflict great bodily harm or during the perpetration or attempted perpetration of an armed robbery. In other words, the evidence was sufficient for the jury to find the defendant guilty of second degree murder.
Although the defendant objected to the admission of Neal's testimony at trial as hearsay,[1] Neal contradicted the defendant's statement that the victim permitted *1186 him to use his vehicle, testifying that he was present when the victim told Plaisance that he had to move out because the defendant had used the his vehicle without his permission on Saturday night. Detective Kaufman confirmed that the defendant's statement that the victim permitted him to use his vehicle was false. Detective Hamilton, too, alluded to this, testifying that he learned that the defendant's assertion that the victim lent him his vehicle possibly was false. Neal also testified that the victim was terrified at the sight of a gun. Thus, from Neal's testimony, the jury could have inferred that the victim would not have allowed the defendant to use his vehicle and never would have wrestled with him for control of the gun.
As to the forensic evidence, Dr. Traylor concluded that the muzzle of the gun was one to three inches away from the victim's head when the gun discharged because he observed soot, as well as searing from the heat generated by the blast, around the entry of the wound. Dr. Traylor opined that it was highly unlikely that a weapon would discharge accidentally one to three inches from a person's head. Also, Dr. Traylor found no visible gunpowder soot on the victim's hands, suggesting that the victim's hands were not near the gun when it discharged.
Officer Winbush, testified that the gun that fired the fatal bullet was a single action revolver, explaining that one had to manually cock the gun to fire it. Once cocked, the trigger required 4.5 pounds of pressure for discharge. This testimony clearly contradicts the defendant's claim that the gun discharged accidentally. Thus, we find no merit to the defendant's argument that his statement contains a reasonable hypothesis of innocence.
Notably, too, the defendant admitted not only that he fled the scene of the shooting, but that he intentionally evaded the police for several hours afterward. His flight is a circumstance from which guilt can be inferred. State v. Smith, 98-2645 (La. App. 4 Cir. 1/26/00), 752 So.2d 314, 317-318.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 1
In Assignment of Error No. 1, Plaisance complains that the record is incomplete in numerous respects.
La. Const. Art. I, § 19 provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La.C.Cr.P. art. 843 requires, in all felony cases, the recording of "all the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel." As a corollary, La. R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel. State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214, 215. Where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform the duty of appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial. Id. However, this court *1187 has held that under some circumstances a complete appellate review of a conviction and sentence can be accomplished, even when portions of the trial record are missing. See, e.g., State v. Cooley, 98-0576 (La.App. 4 Cir. 12/2/99), 747 So.2d 1182, 1187.
A slight inaccuracy in a record or an inconsequential omission from it that is immaterial to a proper determination of the appeal will not cause an appellate court to reverse a defendant's conviction. State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713, 722. Indeed, an incomplete record may nonetheless be adequate for appellate review. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473, 480. Finally, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts. Id.
Plaisance first complains that a portion of the Witherspoon, or death penalty, qualification voir dire is missing from the record. A defendant tried for a capital offense who does not receive the death penalty has no valid Witherspoon voir dire complaint. See State v. Edwards, 406 So.2d 1331, 1346 (La.1981). Plaisance was tried for first degree murder, but found guilty of the responsive verdict of second degree murder and sentenced to life imprisonment. Thus, he cannot raise this claim. Additionally, appellate counsel represented the defendant at trial. Defense counsel cites his own trial notes taken during the Witherspoon voir dire, yet he fails to cite specifically any alleged error occurring therein. Further, a partial transcript of the Witherspoon voir dire is contained in the record, yet the defendant cites no errors therein.
In support of his argument, the defendant relies on the decision in State v. Landry, supra, where the Louisiana Supreme Court reversed a defendant's conviction and remanded the case for a new trial on the grounds that the record was incomplete and inaccurate. However, Landry involved a defendant who received the death penalty and, thus, was entitled to raise Witherspoon issues. In addition in Landry, unlike the instant case, the appellate counsel and trial counsel were not the same.
Although the defendant quotes Landry with respect to the general voir dire transcript failing to identify the juror who is speaking on a myriad of occasions, and reporting jurors' responses as "inaudible response" in numerous instances, he fails to raise specific instances of prejudice. We also note that in reviewing the voir dire transcript, most prospective jurors can be identified because either the prosecutor or defense counsel refers to the jurors by name.
The defendant next argues that the record does not contain transcriptions of the general voir dire bench conferences during which the State and defense made peremptory strikes and challenges for cause. He claims that he was prejudiced by the absence of the bench conference transcripts because this court cannot review his claim, asserted in another assignment of error discussed below, that the trial court erred in denying him the right to back strike jurors.
In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, cert. denied, Deruise v. Louisiana, ___ U.S. ___, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001), the defendant, who was sentenced to death, complained that the record was incomplete in that the court reporter did not record the bench conferences at which peremptory challenges and *1188 challenges for cause were made by the prosecutor and defense counsel. The same complaint is raised by Plaisance in the instant case. Rejecting that claim of error, the Louisiana Supreme Court stated:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. State v. Hoffman, 98-3118, p. 49 (La.4/11/00), 768 So.2d 542, 586. However, in Hoffman, we interpreted Article 843's requirement that "objections" and "arguments" be recorded as normally applying only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke Article 843. Id. We further determined in that case that, similarly, Art. I, § 19's mandate that "evidence" be recorded does not encompass bench conferences; at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843. Id. at 587.
While the defendant points to several different bench conferences that occurred off-the-record, primarily involving evidentiary matters, we first note that many of those matters were preserved for review, because defense counsel lodged objections on the record at trial, and have been raised on appeal. As for the remainder of the unrecorded bench conferences, the defendant has not demonstrated any specific prejudice which he suffered as a result of those conferences not being transcribed; nor does anything in the record suggest that the conferences had a discernible impact on the proceedings. See Hoffman, 768 So.2d at 587 (finding that where defendant could point to no specific prejudice, the failure to record bench conferences did not constitute reversible error); Castleberry, [98-1388 (La.4/13/99), 758 So.2d 749] 758 So.2d at 772-73 (stating that absence from the record of four unrecorded bench conferences did not deny defendant effective appellate review); State v. Brumfield, 96-2667, pp. 14-16 (La.10/28/98), 737 So.2d 660, 669-670 (holding that the trial court's failure to have each bench conference and ruling properly transcribed was not reversible error when the defendant failed to show that he was prevented from presenting any relevant evidence and failed to establish that any prejudice resulted from the absence in the record.) (footnote omitted).
98-0541 at p. 15, 802 So.2d at 1237.
While the record does not contained transcripts of the general voir dire bench conferences, a minute entry from the trial reflects that the trial court excused twenty-seven jurors for cause, that the defendant exercised seven peremptory challenges, and that the State exercised nine. As stated above, the fact that the record does not contain transcripts of the general voir dire bench conferences does not automatically warrant reversal. The defendant must demonstrate that he suffered specific prejudice as a result of those conferences not being transcribed. The defendant's Assignment of Error No. 7, raising the issue of back strikes, is discussed below.
The defendant next complains that the record does not contain a transcript of the motion to suppress hearing at which he challenged the admissibility of his statement to police. Since, the filing of the defendant's brief, however, that State supplemented the record with the *1189 transcript from the motion to suppress hearing.
The defendant also cites numerous other portions of transcripts allegedly missing from the record: (1) seven bench conferences; (2) the defendant's motion to quash; (3) the argument and ruling on defense motions in limine as to blood spatter evidence and the defendant's motion to redact other crimes evidence from his custodial statement; (4) a portion of the trial transcript, claiming that the transcript of the trial began in mid-sentence, indicating that proceedings were already under way; (5) the full argument of defense counsel's objection to the jury charge; (6) the jury charge conference; (7) the defendant's full objections to the jury charge, the trial court's reasons for denying those objections, and the defendant's motion for mistrial; (8) the return of the jury verdict in open court; (9) the defendant's motion for recess to obtain a missing witness; (10) the defendant's arraignment; and (11) numerous pre-trial hearings in which allegedly crucial representations and admissions were made by the Statelisting sixteen minute entries by reference to page numbers.
As for the above listed alleged missing portions of transcripts, Plaisance fails to state how he was prejudiced by the absence of these materials from the record. The record was supplemented with a transcript of the motion to quash on 6 November 2000, six months prior to the date the defendant filed his original brief on appeal. Further, the defendant never complained on appeal that the trial court erroneously denied his motion to quash. Likewise, he raised no issue on appeal with regard to a reference in his statement to any prior bad acts. Moreover, one week prior to trial, this court granted the defendant's application for supervisory writ, and ruled that portions of the defendant's statement that referenced other crimes not relevant to the instant offense, or that were otherwise not admissible under La. C.E. art. 402, were to be excised from the statement.[2] In addition, the record was supplemented on 6 November 2000 with a transcript of the proceeding at which the defendant argued a motion in limine seeking to prohibit the State from using or referring to the defendant's alias. This court denied the defendant's writ application pertaining to the trial court's ruling as to the his motion in limine insofar as blood spatter evidence,[3] and the State presented no blood spatter evidence at trial.
Notably, the trial transcript begins with the trial court referring to that writ denial by this court, and the court asking whether they were back on the defendant's case. At the beginning of trial outside of the presence of the jury, the court stated that it wanted to verify the dispositions of the writs taken in the case. Plaisance has not alleged that any specific errors occurred at that time. Considering that appellate counsel represented the defendant at trial and he has not demonstrated how missing portions of the transcript prejudiced the defendant, the absence from the record of any portions of transcripts of these various pre-trial proceedings does not deny the defendant his right to an appropriate and full review of his appeal.
This assignment of error lacks merit.

*1190 ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, the defendant complains that the trial court erred in allowing hearsay testimony by Neal. Specifically, he contends the trial court erred in overruling his objection and allowing Neal to testify that he was present in the victim's home when the victim told Plaisance that he had to move from the victim's home because he had used the victim's vehicle without his permission.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 765. Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Richardson, 97-1995 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 121.
The record reflects that immediately prior to the State calling Neal to testify, defense counsel expressed concern to the court that Neal would give hearsay testimony that the victim was preparing to kick Plaisance out of his home. Over defense counsel's hearsay objection, the trial court allowed Neal to testify that he had been to the victim's home the Sunday before the shooting and had personal knowledge of the living situation while the defendant was staying there. According to Neal, the relationship between the victim and the defendant was not very good, and he witnessed the victim telling the defendant that he had to leave his house by Tuesday because the defendant had taken the victim's car without his permission on Saturday night.
The State argues that Neal's testimony was admissible to prove that the defendant had a motive for the killing.
In the testimony at issue here, the victim's statement constituted an out of court assertion of his state of mind, that is, his intent to evict the defendant from his house. It is hearsay. See McCormack on Evidence, § 249 (5 Ed.1999). Declarations of mental state are generally admissible, as an exception to the hearsay rule, if introduced to prove the state of mind of the declarant, when that state of mind is at issue. State v. Sheppard, 371 So.2d 1135 (La.1979). Here, however, the state of mind of the declarant (the victim) was not at issue. What was at issue, instead, was the state of mind of the defendant, as argued by the State, to prove that the defendant had a motive for the killing.
Hearsay evidence of a victim's declaration of intent may not be introduced to prove a defendant's motive absent evidence to show that the victim's intention was actually communicated to the defendant. See State v. Doze, 384 So.2d 351 (La.1980); State v. Trahan, 543 So.2d 984 (La.App. 3 Cir.1989), overruled in part on other grounds, State v. Simpson, 551 So.2d 1303 (La.1989).
In the instant case, other than Neal's testimony, no evidence exists to indicate that the defendant knew the victim intended to evict him from his home. That being the case, the trial judge erred in admitting Neal's testimony.
Although it was error to admit this testimony, such error warrants reversal only if it affected the substantial rights of the accused. La.C.Cr.P. art. 921. To determine whether an error is harmless, the proper analysis is "not whether, in a *1191 trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 845 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)). The reviewing court must be able to conclude that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Hearold, supra.
Here, the defendant admitted to shooting the victim, but claimed it was accidental. Thus, the admission of Neal's testimony could have been prejudicial to the defendant only if it led the jury to reject his accidental homicide defense solely because the evidence was inconsistent with that defense. It is possible that the jury rejected the accident defense because it accepted the forensic evidence, particularly Dr. Traylor's testimony, that, more likely than not, the gun did not discharge accidentally. On the other hand, the jury could have easily concluded on the basis of the defendant's own statement that he intended to kill the victim or to inflict great bodily harm or steal the victim's vehicle, and that the shooting was not accidental. Plaisance admitted that he had the loaded gun, that it was cocked while he and the victim were in the car, and that after the shooting, he pushed the victim's body from the vehicle and drove off. Thus, we find the guilty verdict in this case was not attributable to the admission of Neal's hearsay testimony.
Also, in this assignment of error, the defendant claims that the trial court erred in permitting the State to elicit from Neal testimony regarding the victim's habitual reaction to guns. On appeal, the defendant argues that the State failed to lay a proper foundation by showing that Neal had seen the victim's reaction to guns on more than one occasion. However, at trial, defense counsel only raised a hearsay objection to Neal's testimony in this regard.
La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Buffington, 97-2423 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346. As the defendant's argument on appeal differs from his objection at trial, he is precluded from raising the issue on appeal. We find no merit to this claim of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, Plaisance claims that the trial court erred in permitting the State to introduce evidence of prior bad acts, specifically, testimony from Neal and Detectives Hamilton and Kaufman that the defendant had taken the victim's vehicle prior to the shooting and Neal's testimony that he had seen the defendant eject men much larger than himself from the Double Play Bar on regular occasions. The defendant argues this evidence is inadmissible because the State failed to give proper notice.
La. C.E. art. 404(B)(1) provides in pertinent part that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity there-with," but "may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, *1192 the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes...." Generally, evidence of other crimes, wrongs, or acts is inadmissible at trial because of the likelihood that the trier of fact will convict the accused of the immediate charge based on his or her prior crimes, wrongs, or acts. See State v. Jones, 99-0861 (La.App. 4 Cir. 6/21/00), 769 So.2d 28.
The record reflects that the defendant filed a written motion seeking notification of any evidence of prior bad acts that the State intended to introduce against the defendant. Nothing in the record indicates that the State gave the defendant notice of its intent to introduce Neal's statement that the defendant used the victim's vehicle without his consent as evidence of a prior bad act or for any other permissible purpose. At trial, defense counsel specifically objected to the admission of Neal's statement on the grounds that it was inadmissible evidence of a prior bad act.
The use of a motor vehicle belonging to another, without the other's consent, is a felony offense punishable by imprisonment with or without hard labor for not more than ten years. La. R.S. 14:68.4. Thus, one might argue that Neal's testimony that the defendant used the victim's vehicle without his consent was inadmissible evidence of an unadjudicated crime. See State v. Pollard, 98-1376 (La.App. 4 Cir. 2/9/00), 760 So.2d 362. Nonetheless, it would be admissible to show motive, ill will, et cetera. Assuming it was inadmissible because the State failed to give the defense proper notice, or for any other reason, the erroneous admission of other crimes evidence is subject to the harmless error rule. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102; State v. Barnes, XXXX-XXXX (La.App. 4 Cir. 11/7/01), 800 So.2d 1124.
Detectives Hamilton and Kaufman also testified and alluded to the substance of Neal's testimony regarding the defendant's taking of the victim's vehicle without permission. Defense counsel objected to their testimony on hearsay grounds only, and the objections were overruled. Thus, the defendant is limited on appeal to arguing that their testimony was inadmissible only on hearsay grounds, not that it was inadmissible evidence of prior bad acts. La.C.Cr.P. art. 841(A); Buffington, supra.
Again, in view of the forensic and ballistic evidence as well as the defendant's statement, we conclude the guilty verdict rendered in this trial was surely unattributable to any error in permitting Neal and the detectives to testify as to the defendant's use of the victim's vehicle without consent. The error was harmless. Snyder, supra.
In addition, we find no merit to the defendant's claim that Neal's testimony that the defendant ejected persons from the Double Play constituted inadmissible evidence of a prior bad act. Neal testified, without objection, that Plaisance worked at the Double Play as a bouncer. A "bouncer" is defined in pertinent part as "[a] person employed to expel disorderly persons from a public place, especially a bar." The American Heritage College Dictionary (3d Ed.1993). Expelling persons from an employer's bar is a duty of one lawfully employed as a bouncer. Neal's statement that the defendant ejected persons from the bar did not refer to a crime, wrong, or bad act.
This assignment is without merit.

*1193 ASSIGNMENT OF ERROR NO. 5

In the fifth assignment of error, the defendant argues that the trial court erred in denying his oral motion for a two-day recess, after the close of the State's case, to secure the attendance of a witness who had left the state. Plaisance claims that he sought to secure the witness to testify to rebut the State's improper introduction of good character evidence of the victim in its case in chief. Nothing in the record reflects that the defendant moved for a recess at trial. As previously noted, however, portions of the trial transcript are missing from the record. Thus, for appeal purposes, we will assume that the motion was made.
La.C.Cr.P. art. 708, relative to continuance and recess, provides:
A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.
A motion for a recess is evaluated by the same standards as a motion for a continuance. State v. Hodges, 98-0513 (La.App. 4 Cir. 11/17/99), 749 So.2d 732, 739. La. C.Cr.P. art. 709, relative to the granting of a continuance based upon the absence of a witness, provides:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
The record reflects that at the sentencing hearing the trial court initially considered the defendant's motion for a new trial, at which defense counsel acknowledged that the witness had been subpoenaed for trial, but failed to appear. Defense counsel offered no explanation for the witness's absence and failed to show that he had used due diligence to procure his attendance at trial. In view of this, we find the defendant failed to demonstrate a sufficient showing under La.C.Cr.P. art. 709 to justify the granting of a two-day recess to secure the witness. The decision to grant or deny a motion for a recess is within the sound discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of discretion. Hodges, supra. Plaisance has failed to show that the trial court abused its discretion in denying his motion for a recess.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 6
In the sixth assignment of error, Plaisance claims that numerous errors occurred during voir dire.
He first claims that the trial court erred in not allowing him to "back strike" jurors.[4] La.C.Cr.P. art. 788 states, in pertinent part, that when a prospective juror is accepted by the State and the defendant, *1194 he or she shall be sworn immediately as a juror, but that the article is subject to the provisions of La. C.Cr.P. arts. 795 and 796. La.C.Cr.P. art. 790 provides that when selection of jurors and alternates has been completed, "and all issues properly raised under Article 795 have been resolved," the jurors shall be sworn together. La. C.Cr.P. art. 795 sets forth the time for exercising challenges, and subsection (B)(1) provides simply that peremptory challenges shall be exercised prior to the swearing of the jury panel. In State v. Watts, 579 So.2d 931 (La.1991), the court granted a writ of certiorari with an order stating: "A juror temporarily accepted and sworn in accordance with LSA-C.Cr.P. Art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with LSC.Cr.P. Art. 790. LSA-C.Cr.P. Art. 795(B)(1)." See also State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 376 ("peremptory challenges are exercisable at any time before the jury panel is sworn," citing La.C.Cr.P. arts. 788, 790, 795(B)(1) and Watts, supra).
In the instant case, defense counsel argues that he initially accepted certain jurors whom he would have peremptorily struck had he known that the trial court would not allow back strikes. Defense counsel avers in an affidavit attached to the defendant's brief that there were several members of the first panel of jurors initially selected that he would have challenged had back strikes been allowed. Similarly, in another affidavit attached to the defendant's brief, Danalynn Racker, the defendant's assistant trial counsel, attested that there was at least one member of the jury that defense counsel would have challenged for cause on a back strike.[5] Although the record contains a full transcript of the general voir dire, the defendant does not refer to a single juror he would have back struck.
"The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily...." La. Const. Art. I, § 17. La. C.Cr.P. art. 795(B)(1) provides for back strikes, as interpreted by the Louisiana Supreme Court in Watts, supra. Accepting the defendant's claim that the trial court would not allow back strikes, we find it erred in doing so. Nonetheless, the erroneous denial of the right to back strike is subject to harmless error review. Taylor, supra. To review for harmless error, it is necessary to analyze whether the voir dire afforded the defendant was sufficiently full. Id. This is accomplished by examining the voir dire as a whole. Id.
In Taylor, the defendant argued that he would have struck a specifically named juror. The State, defense, and the trial court had agreed at the outset to employ a *1195 system of simultaneous challenges. When the defendant failed to use any peremptory challenges on the first panel of twelve prospective jurors, the State objected that the defendant was thwarting the rule of simultaneous challenges. The trial court agreed, and said it would not allow back strikes, but permitted the defendant to reconsider two jurors from the first panel, one of whom the defendant challenged peremptorily. From the second panel on, the parties knew the trial court would not allow back strikes. On the fifth panel, the defendant exercised one of his five remaining peremptory challenges, but did not strike a particular juror. At that point, all twelve jurors had been selected, with only the alternates left to be chosen. After the alternates were chosen, but before the entire panel was sworn, the defendant said he wanted to exercise his remaining peremptory challenges, and the trial court refused to let him do so. On appeal, the defendant complained that he was prejudiced because he would have back struck one specific juror. The court found no prejudice as to the specific juror, noting in part that the defendant had not exhausted his peremptory challenges.
In the instant case, the record reflects that defense counsel thoroughly questioned the jurors during the general voir dire. Other than the denial of back strikes, the defendant was afforded a right to full general voir dire. A minute entry reflects that the defendant used only seven of his twelve peremptory challenges. As the defendant has failed to identify from the first panel a specific juror whom he would have back struck, and the record does not reflect any unsuitable jurors from the first panel, we cannot say that the defendant was prejudiced by the trial court error.
Plaisance next claims that the trial court erred in forcing him to accept or strike every other venire member, requiring the State to do so on alternating venire members. He maintains that he objected to this procedure.
La.C.Cr.P. art. 788 provides:
A. After the examination provided by Article 786, a prospective juror may be tendered first to the state, which shall accept or challenge him. If the state accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him. When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror. This Article is subject to the provisions of Articles 795 and 796.
B. If the court does not require tendering of jurors, it shall by local rule provide for a system of simultaneous exercise of challenges.
The trial court in the instant case erred in failing to tender all prospective jurors to the State first, as provided by La.C.Cr.P. art. 788(A). The only alternative was to provide for a system of simultaneous exercise of challenges, if such was provided by local rule. La.C.Cr.P. art. 788(B). The trial court failed to do that either.
The defendant cites State v. Ferguson, 187 La. 869, 175 So. 603 (1937), wherein the trial court ruled that the State could examine the prospective jurors and tender them to the defendant's counsel to accept or reject, with the State having the right to reexamine the jurors if it so desired, and to then accept or reject them as it saw fit. The defendant eventually exhausted all of his peremptory challenges. On appeal, the court stated:

*1196 We do not know of any rule of procedure or practice more thoroughly established, or more uniformly followed in the trial of criminal cases in this State, than in the impaneling of juriesthe State must exercise her right of challenge first and then present the juror to the accused for his acceptance or rejection....
It is our opinion that the reversal of the order of challenging jurors in this case by the trial judge was a direct violation of a substantial right guaranteed the accused under the Constitution and constitutes reversible error; .... (emphasis added).
The instant case is distinguishable from Ferguson in that here the defendant did not exhaust all of his peremptory challenges; he had five remaining at the close of voir dire. The defendant in Ferguson exhausted all of his peremptory challenges, and may have used some of them on jurors that would have been struck by the State. The constitutional right referred to by the court in Ferguson was the defendant's right to challenge jurors peremptorily, now guaranteed by La. Const. Art. I, § 17. As voir dire in the instant case concluded with the defendant having five unexercised peremptory challenges, he has failed to show that his constitutional right to peremptorily challenge jurors was prejudiced by the alternating tender procedure employed by the trial court.
We conclude the trial court's error in not allowing back strikes and the method employed in exercising challenges was harmless; the guilty verdict rendered in this case was surely unattributable to the errors. See Taylor, supra.
We find no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7
In the seventh assignment of error, the defendant claims that the State argued facts not in evidence in its closing argument. Specifically, Plaisance refers to the prosecutor's reference to bloodstains on the seat belt of the victim's vehicle in his rebuttal argument.
The record reflects that during the State's rebuttal defense counsel objected, arguing that no evidence indicated that blood was found on the seatbelt, only on the headrest, as testified to by Detective Kaufman. The trial court interrupted, instructing counsel to "argue the case." While the defendant argues that the trial court did not sustain defense counsel's objection here, the record reflects otherwise. The trial court informed the jurors that what the prosecutor said was only argument, and that it would later instruct them. In its charge to the jury, the trial court instructed that what was said by the attorneys in opening statements and closing arguments was not evidence, and that the jury was to decide the case on the testimony from the witnesses and exhibits that were introduced during trial. At the conclusion of argument, defense counsel revisited the alleged error, moving for a mistrial. The trial court stated that at the time of defense counsel's original objection, it was attempting to sustain defense counsel's objection and move forward. The court denied the motion for a mistrial. The defendant does not argue that the trial court erred in denying his motion for a mistrial.
If the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the *1197 verdict. State v. Ricard, 98-2278 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397, writ denied, XXXX-XXXX (La.12/18/00), 775 So.2d 1078. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 716; Ricard; supra.
In view of the trial court's explanation and crediting the jurors in this case with good sense and fairmindedness, we are not convinced that the State's reference to blood on the seatbelt influenced the jury and contributed to the guilty verdict.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 8
In the eighth assignment of error, Plaisance argues that the trial court erred in instructing the jury in four respects.
La.C.Cr.P. art. 801 provides in pertinent part that "[a] party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error." The record reflects, in a matter taken up after the jury retired, that the defendant timely lodged two objections to the trial court's jury instructions or proposed jury instructions: (1) that the trial court left the jury with the impression that intent is not a fact; and (2) that the trial court erred in instructing the jury that it could convict of manslaughter if it found that the homicide was committed, without any intent to kill or inflict great bodily harm, during an attempted armed robbery.
As to intent, the trial court instructed the jury as to specific and general intent, and then stated:
Intent is a state of mind. It cannot be seen or photographed. Though intent is a question of fact, it need not be proven as fact. It may be inferred from the nature and facts of the case. It may be inferred from the circumstances of the transaction. It may be inferred from all of the circumstances established during trial.
In State v. Tilley, 99-0569, p. 21 (La.7/6/00), 767 So.2d 6, 24, cert. denied, Tilley v. Louisiana, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001), the Louisiana Supreme Court stated: "Though intent is a question of fact, it need not be proven as fact; it may be inferred from the circumstances of the transaction." Clearly, no error exists in the trial court's jury instruction on intent in this case.
As to the defendant's second claim of error preserved for review, the trial court erred in instructing the jury on manslaughter as follows:
Manslaughter is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm but the killing is committed in sudden passion or heat of blood immediately caused by provocation. [sic] sufficient to deprive an average person of his self-control and his cool reflection. Thus in order to find the defendant guilty of manslaughter, you must find that the defendant killed George Hood and that the defendant had a specific intent to kill or inflict great bodily harm and that the killing was caused by sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Sudden passion or heat of blood, or there is a second way to be guilty of manslaughter here. That is the defendant killed George Hood, *1198 whether or not he had a specific intent to kill, and that the killing took place when the defendant was engaged in an attempted commission of an armed robbery. Leave out intent. Specific intent.
La. R.S. 14:31(A)(2)(a) defines manslaughter, in pertinent part, as a homicide committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration of any felony not enumerated in La. R.S. 14:30 and 30.1 (the statutes proscribing first and second degree murder, respectively), or of any intentional misdemeanor directly affecting the person. La. R.S. 14:30 and 30.1 both enumerate the offenses of armed robbery and attempted armed robbery. Thus, a perpetrator commits second degree murder when he kills while engaged in the perpetration or attempted perpetration of an armed robbery, in the absence of a specific intent to kill or inflict great bodily harm.
The defendant argues that, in view of the erroneous manslaughter instruction, this court cannot determine why the jury returned a verdict of second degree murder rather than the verdict of manslaughter. The defendant is correct that the trial court's charge as to second degree murder and manslaughter instructed the jury, in part, that it could convict of both offenses on the same evidence. However, the defendant fails to demonstrate that he was prejudiced by the jury's failure to follow the erroneous jury instruction. In this case, the erroneous manslaughter instruction was a harmless error. That is, the second degree murder guilty verdict rendered in this case is surely unattributable to the erroneous instruction. See Snyder, supra.
The defendant also claims the trial court erred in giving a flight instruction to the jury. The record reflects that subsequent to the jury's retiring for deliberations, the trial court noted that it reviewed with all counsel the jury charges requested by the defense and added an instruction of flight requested by the State. Because the transcript abruptly ends, the record does not contain the alleged defense objection. Nonetheless, for purposes of this appeal, we will assume that the objection to the flight charge was made.
In reviewing the evidence, we find no merit to the defendant's argument that the flight instruction was not warranted. The defendant freely admitted that he fled the scene of the shooting. This alone justified the flight instruction. Moreover, Plaisance admitted in his statement that he evaded the police after fleeing. We further note that the trial court's flight instruction informed the jury that flight alone is not indicative of or sufficient to prove guilt, and that a person who is not guilty may flee to prevent his conviction for a crime of which he is innocent.
Lastly, the defendant claims the trial court erred in failing to instruct the jury on the penalties for both first and second degree murder. The record does not reflect an objection as to this issue, and the defendant does not represent that he lodged an objection. Accordingly, the defendant is precluded from raising this assignment of error on appeal. La.C.Cr.P. art. 801.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 9
In this assignment of error, Plaisance claims that the trial court erred in denying him the right to recross examine numerous State witnesses. However, the defendant mentions only Detective *1199 Hamilton and Dr. Traylor. Thus, review will be limited to these two witnesses and the cited instances.
Permitting of recross examination is within the sound discretion of the trial judge, and in the absence of an abuse of that discretion and resulting prejudice, the ruling will not be disturbed on appeal. See State v. Hidalgo, 95-319 (La.App. 4 Cir. 1/17/96), 668 So.2d 1188, 1194; State v. Brooks, 94-1031 (La.App. 5 Cir. 5/30/95), 656 So.2d 772, 775.[6] However, La. C.E. art. 611 states that "[w]hen the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters." (Emphasis added).
The defendant claims he was entitled to recross examine Detective Hamilton because on redirect examination the detective testified for the first time, over his objection, that the two bars frequented by the defendant, one at which he worked as a bouncer, catered to homosexuals.
The record reflects that Detective Hamilton said nothing about the two bars during his direct examination. Thus, the trial court erred in denying defense counsel the right to recross Detective Hamilton on the new matter brought out on redirect examination. Although defendant argues that he was prejudiced, he does not suggest how. Because Sprouse, too, testified that the defendant worked in a gay bar, in the absence of any obvious prejudice, we find the guilty verdict rendered in this case was surely unattributable to the trial court's error.
The defendant also cites Detective Hamilton's statement on redirect examination indicating that he learned during further investigation that the defendant was asked to move from the victim's residence. Detective Hamilton also negatively responded when asked whether the defendant had told him that information. The record reflects this testimony was new matter, and the trial court erred in denying the defendant the right to recross examine Detective Hamilton about it. But again, the defendant fails to demonstrate that he was prejudiced by Detective Hamilton's testimony. In the absence of any prejudice, we find that the guilty verdict rendered in this case was surely unattributable to the trial court's error in not allowing the defendant to recross examine Detective Hamilton.
Plaisance cites Dr. Traylor's testimony on redirect examination that nothing indicated alcohol or any commonly abused drugs in the victim's system. This record also reflects this testimony was new matter, and the trial court erred in failing to permit the defendant to recross examine Dr. Traylor about it. Nonetheless, the defendant did not argue that the victim was intoxicated. Because the defendant fails to suggest how he was prejudiced by the trial court's denying him the right to cross examine the doctor on this point, we find the verdict was unattributable to the error.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 10
Finally, the defendant avers that the cumulative effect of the cited errors warrants reversal, even if each alone is harmless.
The Louisiana Supreme Court has held that the cumulative effect of harmless *1200 errors does not warrant reversal of a conviction or sentence. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218, 239. After reviewing this record, we cannot say and do not find that the cumulative effect of the harmless errors warrants a reversal of the defendant's conviction.
We find no merit to this assignment of error.

CONCLUSION
Accordingly, for the above reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Whether admissible or inadmissible, this hearsay evidence is to be considered when assessing the conviction for sufficiency of the evidence. See State v. Hearold, 603 So.2d 731, 734 (La.1992).
[2] State v. Plaisance, unpub., 99-2310 (La.App. 4 Cir. 9/15/99).
[3] State v. Plaisance, unpub., 99-2311 (La.App. 4 Cir. 9/16/99), writ denied, 99-2708 (La.9/17/99), 747 So.2d 554.
[4] Back striking refers to a party's exercise of a peremptory challenge to strike or excuse a prospective juror after initially accepting him, but prior to the final swearing of the jury panel.
[5] Both appellate counsel and Racker attest in their affidavits that they would have challenged the juror or jurors for cause. La. C.Cr.P. art. 795(A) provides that a juror shall not be challenged for cause after having been temporarily accepted, unless the challenging party shows that the cause was not known to him prior to that time. As there is no indication that the defense team discovered a cause for challenging any juror for cause after initial acceptance, there could have been no back challenge for cause. However, the only reason the affidavits are attached to the brief is because the record is incomplete. Thus, it must be considered that the affiants meant to attest that there were jurors they would have challenged peremptorily had the trial court not erroneously denied them the right to use back strikes.
[6] In both Hidalgo and Brooks the courts found that no new matter had been brought out on redirect examination.