DO NOT PUBLISH

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-1340

STATE OF LOUISIANA

VERSUS

BOBBY JOE STATUM

**********
APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO.CR-696-2004
HONORABLE STUART S. KAY, DISTRICT JUDGE

**********

J. DAVID PAINTER

**********

Court composed of John D. Saunders, Glenn B. Gremillion, and J. David Painter, Judges.

AFFIRMED.

David W. Burton
District Attorney, 36th Judicial District
P. O. Box 99
DeRidder, LA 70634
Counsel for Appellee:
        State of Louisiana

Michael M. Evans, II
Attorney at Law
416 N. Pine Street
DeRidder, LA 70634
Counsel for Defendant-Appellant:
        Bobby Joe Statum

**PAINTER, Judge.**

Defendant, Bobby Joe Statum, appeals his conviction for manslaughter in connection with the death of James Mills. He asserts that the evidence was insufficient to convict him of manslaughter and that the trial court abused its discretion in failing to recess the trial to allow his forensic entomologist to testify regarding samples taken from the crime scene.

## FACTS

On November 18, 2003, Defendant, several other men, and Mills were at Willie Stains' fishing camp. The last time Mills was seen alive, he was walking away from the camp with Defendant. Mills was discovered dead outside of his trailer by a friend on November 20, 2003.

The investigation of Mills' death revealed that he sustained a skull crushing blow to the head as well as multiple lacerations and cuts, one of which severed the jugular vein. According to the testimony, it appears that Mills received the wounds while he was inside his camp and was later dragged outside where his body was found. The coroner testified that the estimated time of death was late on November 18, 2003, or early morning on November 19, 2003. Dr. Erin Watson, an entomologist, opined in her report that the time of death was between sunset on November 19, 2003, and sunrise on November 20, 2003.

Inside the trailer, the assailant left tread prints from his tennis shoes in Mills' blood. During the investigation, authorities learned that on or about November 30, 2003, Defendant's mother, Betty Statum, found a pair of Defendant's tennis shoes under her bed and disposed of them in a river. A shoe similar to the ones discarded by Ms. Statum was found on January 9, 2004, about one and a half miles down the

1

river from where she tossed them. According to Bob Fry, a forensic analyst, the shoe was the same brand of shoe, approximately the same size, and had the same tread pattern as the shoe that made the impressions at the crime scene.

A bloody cigarette butt was found outside near Mills' body. The DNA from the bloody paper on the butt and the filter were tested and indicated that Mills' DNA from the blood was on the paper, and Defendant's DNA was in the filter.

Lastly, a fellow inmate testified that Defendant admitted to killing Mills. According to the inmate, Defendant stated that he used a knife and a baseball bat in the commission of the crime.

## PROCEDURAL HISTORY

On March 29, 2005, Defendant was charged by bill of indictment with second degree murder, a violation of La.R.S. 14:30.1. Following a jury trial held on March 20-24, 2006, the jury found Defendant guilty of manslaughter.

Defendant was subsequently charged as a habitual offender on April 24, 2006. Following a hearing held on July 21, 2006, he was adjudicated a fourth felony habitual offender. He was sentenced that same day to serve the remainder of his life at hard labor without benefit of probation, parole, or suspension of sentence. The trial court also noted that Defendant was not entitled to diminution of sentence for good behavior under La.R.S. 15:571.3(C)(2) & (3).

## DISCUSSION

*Sufficiency of the Evidence*

Four of Defendant's five assignments of error concern the sufficiency of the evidence. Defendant argues that the evidence adduced at trial was not sufficient to support a conviction for manslaughter. The remaining assignment concerns the

2

court's refusal to continue the trial so that his expert forensic entomologist could

testify. As noted in *State v. Hearold,* 603 So.2d 731, 734 (La.1992):

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt.

Accordingly, we first address whether the entirety of the evidence is sufficient

to support Defendant's conviction.

> The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of the crime at issue are set forth in La.R.S. 14:31, which states,

in pertinent part:

3

A. Manslaughter is:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;  or

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person;  or

(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.

In his brief to this court, Defendant argues that:

The jury failed to consider the lack of evidence in rendering its verdict as it pertained to the discovery, submission, loss and re-discovery of three hair strands retrieved from the left hand of the victim at the crime scene, *in situ*. Said *de facto* spoliation of evidence was not properly developed by the State in order to determine the identity of the victim's assailant, which act of omission constitutes a failure to undertake a ministerial duty by a political subdivision of the State.

Next, Defendant summarizes the alleged chain of custody involving three human strands of hair found on Mills' left hand. After discussing this, he states:

It is the contention of Appellant that the State committed negligent spoliation in its failure to develop evidence, which had significant bearing on the issue of the Appellant's guilt or innocence. Appellant counsel properly urged a mistrial, based on upon the significant evidentiary value, which would have been potentially outcome determinative, had the State established an appropriate and credible chain of custody, which would have necessarily placed said hair strands under forensic examination, the results of which would have clearly outcome determinative and carefully considered by the trier of fact.

This assignment of error appears to involve a claim of insufficient evidence. However, Defendant's argument, as stated in his brief, fails to set forth a claim upon which this court can grant relief. Defendant appears to be complaining that the State did not develop evidence involving the hairs found on Mills. However, Defendant does not state that his conviction should be overturned due to the alleged lack of evidence involving the three hairs. Further, Defendant does not claim that the evidence, had it been developed, would have exonerated him. Therefore, we find no merit in this claim.

Defendant further argues that the jury failed to consider the lack of evidence as it pertained to the presence of provocation, an element of the offense of manslaughter, by Mills' assailant. In its response to this argument, the State concedes that there was no evidence of provocation by Mills that would have served to reduce the offense from murder to manslaughter. The State asserts that the ruling was clearly a compromise verdict. Further, the State maintains that Defendant cannot complain now of an absence of evidence of provocation because he did not object to the trial court's instruction on manslaughter as a responsive verdict.

In support of its contention, the State refers to *State v. Jenkins*, 02-997 (La.App. 3 Cir. 2/12/03), 846 So.2d 778, *writ denied*, 03-737 (La. 9/5/03), 852 So.2d 1025, wherein the defendant was charged with possession of cocaine with intent to distribute, and the jury returned a responsive verdict of attempted possession of cocaine with intent to distribute. In *Jenkins*, the defendant did not object to the jury being given the choice of that responsive verdict. The court made reference to the supreme court's reasoning in *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 251-52 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432 (1983), as follows:

> [I]f the defendant does not enter an objection [to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict] (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.
>
> It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.

*Id*. at 783 (alteration in original). Considering this, the State contends that the evidence in the instant case would have supported a conviction of the greater offense, second degree murder, and thus, the verdict of manslaughter should be upheld.

Defendant further argues that the jury failed to credit the uncontradicted alibi testimony of the defense witness, David Verdine, and State witnesses, Barbara Fugett and Kathleen Sue White, in determining Defendant's whereabouts on November 18-19, 2003, the estimated date of Mills' death. Finally, Defendant contends that the jury relied upon insufficient DNA evidence in finding that he was present at the time of and was the assailant responsible for Mills' death.

The elements of second degree murder are set forth in La.R.S. 14:30.1, which reads, in part, as follows:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm . . . .

6

The record reflects that during the morning hours of November 18, 2003, Mills and several other men were at Willie Stains' camp. Stains was cooking a brisket that Mills had purchased while Mills and two other men worked on Mills' truck. According to Kevin Barlow, who was at the camp that day, Defendant arrived at the camp around 3:00 or 3:30 p.m. Although Barlow did not see Defendant speak with Mills, Stains stated that he saw Defendant and Mills walking back and forth in front of the camp, talking to one another. Stains testified that Mills and Defendant left the camp some time between 11:00 a.m. and 1:00 p.m., while Barlow stated that Mills left the camp with Defendant around 3:30 or 4:00 p.m. Nonetheless, neither Barlow nor Stains noticed any problems between the two men upon their departure. Stains testified that as the two men walked off he hollered at them to come back because there would be nothing left of the brisket. Mills indicated to Stains that he would be returning shortly. According to Barlow and Stains, Mills never returned.

On November 20, 2003, Ronnie Mills, a friend of Stains, Barlow, and Mills, rode his bicycle to Barlow's camp and told him that someone needed to check on Mills because he had been beaten up and was laying in his yard not breathing. Barlow walked to Stains' camp and borrowed his truck to go to Mills' camp to check on him. Stains instructed Barlow to contact him on his CB radio if an ambulance was needed. Upon arriving at Mills' camp, Ronnie Mills walked up to Mills' body and pulled back the sleeping bag to show Barlow that Mills was not breathing.

Barlow testified that Mills was wearing the same denim shirt that he had on when he left Stains' camp on November 18, 2003. Barlow admitted, however, that Mills, more often than not, would wear a denim shirt and sweat pants. Barlow radioed back to Stains, and Stains radioed Keith Manuel who, in turn, called 911.

7

Deputy John Yerby, Chief of Detectives, testified that he arrived on the scene between 10:00 and 11:00 a.m. He saw Mills lying on his back with his sweat pants pulled down, his denim shirt up around his neck, and partially covered with a sleeping bag. It appeared to Deputy Yerby that Mills had been dragged from inside the trailer, toward the road, and then back to the area where he was discovered outside the trailer. Deputy Yerby testified that no weapons or any instrumentalities that could have attributed to Mills' injuries were found. Other than tire tracks made when another person came to the scene around the same time as Barlow and Mitchell, no identifiable tire tracks or footprints were found outside the trailer due to recent rain.

Deputy Glen Mears was assigned to do crime scene sketches and drawings and to photograph the area of the crime scene. Deputy Mears, along with Detective Joe Toler, photographed the inside of the trailer. Bloody shoe tread marks were found in the trailer, and only one tread design amongst the prints was noted by Deputy Mears.

Deputy Toler testified that he arrived on the scene at about noon and was given the task of processing the crime scene. Deputy Yerby noted a cigarette butt with a partial bloody print just a few feet away from Mills' body. Deputy Toler observed that it was the only cigarette butt on the scene that had a bloody partial print on it. Deputy Toler picked up the cigarette butt wearing gloves and using plastic tweezers to avoid contaminating the evidence. He noted that there was no other blood in the immediate area where the cigarette butt was found.

Deputy Toler stated that he was unable to successfully lift prints from the items that he processed for prints. However, he noted that there were several bloody footprints around a bloody chair inside the trailer and that there was only one tread design in the footprints. According to Deputy Toler, the shoes found inside the trailer

8

belonging to Mills were not similar in any way to the tread design observed in the blood. Because of the massive amount of blood in the trailer, the blood spatters and drag marks therein, and the scrapes on the steps, Deputy Toler opined that Mills was killed in the trailer and dragged outside.

Dr. Terry Welke, the physician for the Calcasieu Parish Coroner's Office, testified that he examined Mills' body on Friday, November 21, 2003. Dr. Welke explained in great detail all of the injuries Mills sustained, including multiple blunt force injuries to the head that caused several lacerations, five cuts, one which severed the jugular vein, and a perforated left eye. Mills also sustained multiple bruises and cuts about his body which Dr. Welke testified were consistent with defensive wounds. When asked if there was any one particular wound that was fatal, Dr. Welke stated that the injury to the left side of the head was one possibility because the skull was broken, and portions of the skull were embedded in the brain. He opined that the skull crushing wound was caused by an object with a blunt side to it. Dr. Welke added that the cuts involving the neck were also a possibility, even though they involved minor blood vessels.

With regard to the timing of Mills' death, Dr. Welke testified that fly eggs were seen in Mills' wounds, as well as maggots up to one-eighth of an inch. Based upon all of his observations and his autopsy results, Dr. Welke opined that Mills' death occurred some time late on Tuesday, November 18, 2003, or during the early morning of Wednesday, November 19, 2003.

The defense submitted the report of the entomologist, Dr. Watson, which was admitted into evidence and read aloud to the jury. Dr. Watson evaluated four vials of insect evidence collected from Mills after he was transported to the Calcasieu

9

Parish Coroner's Office. From this evidence, as well as the crime scene reports and photographs, autopsy report, and climatic data, Dr. Watson opined that Mills' time of death was between sunset on Wednesday, November 19, 2003 and sunrise on Thursday, November 20, 2003. Dr. Watson added, however, that "... [g]iven that it is widely accepted that blow flies do not readily deposit eggs at night, establishing an exact time of death based on this insect evidence would be impossible." She concluded, "The (apparent) presence of eggs only at 1100 hours in crime scene photographs, as well as, only blow fly eggs and first instar larvae collected the same day between 1800-1950 hours strongly suggests that the deceased died sometime before sunrise Thursday morning (i.e., available for insect activity for less than one day)."

Further evidence was adduced concerning the bloody footprint. Defendant's mother testified that during the month of November 2003, she threw away a pair of white tennis shoes belonging to Defendant. She stated that her boyfriend, Jerry Williams, was helping her make her bed and discovered the shoes beneath her bed. After a conversation with Williams concerning the shoes, Ms. Statum decided to dispose of them. She told Defendant, who was incarcerated, that she had found the shoes and threw them into the river on or about November 30, 2003. She maintained at trial that Defendant did not tell her to throw the shoes away.

Deputy Toler testified that on December 28, 2003, he, Detective Mark Herford, and Mrs. Statum went to the river located at the edge of the Sabine tributary but did not find any shoes that day. On January 9, 2004, Deputy Toler retrieved a size ten and a half, white, Starter brand tennis shoe from the river about one and a half miles down the river from Alligator Park. Ms. Statum stated that the shoe was similar to

10

the pair that she discarded in the river. The shoe was compared with the bloody shoe prints found in the trailer, and according to Deputy Toler, the tread on the shoe appeared to match the bloody print. A section of the trailer flooring upon which the bloody shoe prints were found and the shoe found in the river were submitted to the crime lab.

Ms. Statum testified that she did not see any blood on the shoes and could not recall if they were dirty. She did confirm that she had previously given a written statement wherein she declared that the shoes were dirty. On cross-examination, Ms. Statum testified that the shoes were wet when she found them because her waterbed had a leak, not because they had been washed.

Ms. Statum admitted at trial that she had lied about her knowledge of Defendant's shoes when she was first interviewed by deputies. Ms. Statum admitted that she decided to tell the truth when deputies arrived at her home with a search warrant and a warrant for her arrest.

Lee Ann Suchanek, a forensic serologist and DNA analyst with the Southwest Louisiana Crime Lab, stated that she examined the tennis shoe found in the river but did not find any blood on the shoe. Amanda Kleist, a forensic DNA analyst with the Louisiana State Police Crime Lab, testified that she tested the tennis shoe found in the river and was unable to get any DNA off the shoe. With the naked eye, Kleist did not observe any blood stains on the shoe.

Bob Fry, a forensic analyst with the Southwest Louisiana Crime Lab, testified that he analyzed the tennis shoe retrieved from the river along with the section of flooring which contained a bloody footprint. After comparing the shoe with the section of the flooring, Fry was not able to conclude with one hundred percent

certainty that the shoe made the impression. Fry explained that there was not a sufficient amount of the shoe's impression to be able to identity the shoe. He was able to conclude, however, that the same brand and approximately the same size of shoe made the impression. Fry stated that the tread pattern was the same. Also, according to Fry's calculations, the size of the print was about a size ten and a half.

Concerning the cigarette butt evidence, the following testimony was introduced. Suchanek testified that she analyzed a cigarette butt with a bloody print which was submitted to the lab. She confirmed that there was actually blood on the butt, but that the latent fingerprint in the blood was not sufficient for identification.

Kleist testified that she tested the parts of the cigarette butt that were submitted and was able to get a DNA profile from the bloody paper on the butt and from the filter part of the butt. According to Kleist, the reference DNA obtained from Mills matched the DNA taken from the blood stained paper. Also, the reference DNA obtained from Defendant matched the DNA obtained from the filter.

Kleist testified that only Mills' DNA was taken from swabs collected from his ankles and wrists. A mixture of DNA from at least two people was found on Mills' fingernail clippings, a major contributor and a minor contributor. However, Kleist was unable to exclude Mills as the major contributor, and there was not enough evidence with regard to the minor contributor to identify that person.

The record indicates that at the time of his arrest, Defendant had an injured hand. Defendant's alibi turns in part on when and in what way this injury was sustained. Deputy Bud Crowe spoke with Defendant about Mills' death and took a written statement from him. Defendant's written statement was read out loud for the jury. In his statement, Defendant denied killing Mills or knowing who killed him.

12

When asked what happened to his hand, Defendant replied that he had injured it while moving furniture for Sue White. Deputy Crowe testified that while Defendant was giving his statement, he noted that Defendant broke out into a sweat across his forehead right after he was asked about his hand, despite the fact that it was cool that evening. Pictures of Defendant's swollen hand were admitted into evidence.

White testified that she spoke with Deputies Crowe and Franks on November 25, 2003. According to White, Defendant worked for her on two days, but she could not recall the dates. When shown the notes taken from her interview, she recalled telling the deputies that Defendant showed up on Wednesday and helped move furniture from a rental storage unit in Lake Charles, Louisiana to a flea market in Starks, Louisiana. White added that Defendant worked about an eight hour day, and was working alongside a man named Jerry. According to White, she worked in close proximity to Defendant while he was moving furniture, and Defendant never mentioned that he had been injured, nor did he cry out or give any indication that he had been hurt.

Barbara Fugett testified that she worked for White at the flea market, and she recalled moving furniture with Defendant's assistance and with the help of a man named Jerry on a Wednesday. She explained that she worked side by side with Defendant and was loading/unloading the furniture with Defendant in Lake Charles and in Starks. According to Fugett, Defendant did not mention or indicate at any time that he had been injured in any way. Further, she did not see him wince in pain or indicate that he had hurt his hand. Lastly, Fugett testified that she was watching very carefully to be sure no one was injured while moving the furniture.

13

Ms. Statum testified that she noticed Defendant's injured hand and asked him what happened. According to Ms. Statum, Defendant replied that a couch had fallen on it when he was moving furniture at work.

Defense witness, David Verdine, testified that he has known Defendant since he was a child. Verdine was not sure of any dates with regard to his account of the events surrounding Mills' death. He stated that while on his way home one evening, possibly November 18, 2003, Verdine saw Defendant in front of Tub's house, which is located two and one-half to three miles from Mills' camp. Verdine testified that he picked Defendant up and drove him to the road that turns into Defendant's mother's house. Verdine did not notice anything unusual about Defendant or that he was dirty, messed up, or covered in blood. Although he had no specific recollection of the statements he made to deputies when he was interviewed on November 20, 2003, he confirmed that his written statement indicated that he did not see any injuries on Defendant. His statement also reflected that Defendant had a "buzz" and kept saying that he was hurting. Defendant did not say why he was hurting.

Additionally, testimony was adduced concerning statements made by Defendant to a fellow inmate after his incarceration. Inmate Brandon Howell, an acquaintance of Defendant, was incarcerated with Defendant in 2004 and shared a dorm at the Calcasieu Parish Jail. The day after Howell was transported from the jail in DeRidder, Louisiana to the Calcasieu Parish Jail, Howell had a conversation with Defendant about Mills. During that conversation, Defendant stated to Howell that he had killed Mills using a knife and a baseball bat. Defendant indicated to Howell that he killed Mills for drugs and money.

14

Howell gave a statement to Deputy Toler on January 13, 2004, regarding this conversation with Defendant. On cross-examination, Howell testified that he did not ask for assistance with his own case in exchange for the information he learned about Defendant, nor was any assistance offered.

The verdict was based on the jury's assessment of the physical evidence and the credibility of the witnesses. It is a well-settled principle, mentioned in *Kennerson*, that credibility determinations are within the purview of the fact finder and should not be second-guessed on review. The jury was free to believe some, none, or all of any witness's testimony, including the testimony of the defense witness, Verdine. *State v. Rogers*, 494 So.2d 1251 (La.App. 2 Cir. 1986), *writ denied*, 499 So.2d 83 (La.1987). The jury did not find Verdine's testimony to be credible, which is reasonable in light of the fact that he was unable to establish the date he allegedly picked Defendant up and gave him a ride. Further, Verdine's memory and recollection of the time around Mills' death was very vague and did not show that Defendant was not available on November 19th to have committed the crime.

We agree with Defendant that the cigarette butt is the only DNA evidence that links him to the crime scene. However, the jury was presented with other evidence and testimony regarding the bloody shoe tracks left in the trailer and Defendant's shoes, which strongly suggests that Defendant was at the scene. Also, the jury heard the testimony that Mills was last seen with Defendant and that Defendant made statements to inmate Howell about the crime.

We find, therefore, that the combination of the evidence and testimony adduced at trial, when viewed in the light most favorable to the State, was sufficient to prove

15

that Defendant had the specific intent to kill or to inflict great bodily harm on Mills. Accordingly, the jury's responsive verdict of manslaughter should not be disturbed.

*Motion for Recess/Continuance*

Defendant also argues that the trial court committed an abuse of discretion in failing to recess the trial in order for forensic entomologist, Dr. Watson, to testify. Defendant asserts that Dr. Watson was timely subpoenaed to testify about tests she made of entomological samples taken from the crime scene so as to ascertain Mills' approximate time of death. Instead, Defendant complains that the defense was, instead, permitted only to read Dr. Watson's report into the record that was prepared by Dr. Watson. As a result, Defendant maintains that the report as presented was not accorded its proper weight with respect to its determination of Mills' time of death.

Defendant asserts that he met the burden of showing that the assistance of a forensic entomologist was needed to answer a substantial issue or to negate the presence of a critical element in the charged offense, namely Mills' approximate time of death in relation to his whereabouts at that time. In support of his claim, Defendant refers this court to *State v. Touchet*, 93-2839 (La. 9/6/94), 642 So.2d 1213, wherein the court addressed whether an indigent defendant was entitled to an ex parte hearing on his requests for funding an expert witness. Further, Defendant contends that the lack of this expert testimony resulted in a fundamentally unfair trial because the expert's opinion would have supported the testimony of his alibi witness as to Defendant's whereabouts on November 19, 2003.

This case does not concern funding for the expert witness. At trial, defense counsel informed the trial court that Defendant intended to call Dr. Watson to testify and that she had been subpoenaed to testify. Defense counsel explained further that

16

after communicating with Dr. Watson via cell phone, he learned that she had relocated to Alabama and was unavailable due to her attendance at a wedding in Lafayette, Louisiana and because she was conducting interviews in the Baton Rouge, Louisiana area. As a result, defense counsel asked to have the trial continued until the following Monday.

Next, pursuant to La.Code Evid. art. 709, Defendant set forth the facts to which Dr. Watson was expected to testify, the materiality of her testimony, and the need for her presence the trial. He first stated that it would be unfair for the jury to receive a technical report without the benefit of the methodology utilized by Dr. Watson in reaching her conclusions. Next, Defendant maintained that the jury was entitled to see the witness live to see the strength of her conviction that Mills more than likely died on November 19, 2003, not November 18, 2003. The materiality of the time of death, according to Defendant, is that it "dovetails" with the defense theory as to Defendant's whereabouts on November 18th and 19th. Defendant concluded that he could show his whereabouts at all times relevant on November 19th which would raise reasonable doubt as to the time of death and his availability to have committed the crime. In discussing the motion for continuance with Defendant's counsel, the court noted that the Louisiana Code of Criminal Procedure requires that such motions be in writing and that Defendant's motion was oral. The court further noted that Dr. Welke had testified that his conclusion was that the death occurred on the 19th or possibly on the night of the 18th, and that Defendant's expert was expected to testify to the same time frame for Mills' death. The court also noted that the witness had been subpoenaed, that her other obligations were scheduled for the following Friday

17

and Saturday, not the day of trial, and concluded that there was no reason the witness could not have appeared.

Next, Defendant gave notice of his intent to seek supervisory remedial writs and asked that the trial be stayed pending a ruling on same. The trial court denied a stay. Defendant did not seek writs as stated at trial, thus, the issue has not been before this court.

Louisiana Code of Criminal Procedure Article 708 provides:

> A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.

Also, it is well established that motion for a recess is evaluated by the same standards as a motion for a continuance. *See State v. Plaisance*, 00-1858 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, *writ denied*, 02-1395 (La. 11/27/02), 831 So.2d 270, *cert. denied*, 538 U.S. 1038, 123 S.Ct. 2084 (2003); *State v. Hodges*, 98-513 (La.App. 4 Cir. 11/17/99), 749 So.2d 732.

With regard to continuances based upon the absence of a witness, La.Code Crim.P. art. 709 provides:

> A motion for a continuance based upon the absence of a witness must state:
>
> (1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
>
> (2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
>
> (3) Facts showing due diligence used in an effort to procure attendance of the witness.

18

In the instant case, the trial court first determined that Defendant did not demonstrate that Dr. Watson was unavailable to testify on Friday. Next, the trial court addressed the third prong of Article 709 and concluded that Defendant had not shown due diligence in his efforts to get Dr. Watson to trial that day. Given that determination alone, we conclude that the trial court did not abuse its discretion in denying Defendant's motion to recess. The trial court, however, went on to consider the merits of the motion under the first prong of Article 709. The trial court basically concluded that the testimony of Dr. Watson that Mills died on November 19, 2003, would be cumulative in light of Dr. Welke's testimony that Mills' death could have occurred on November 19, 2003. Also, the State agreed to stipulate to the admission of Dr. Watson's report, which contains the assertion that Mills' death occurred on November 19, 2003. *See State v. Smith*, 25,841 (La.App. 2 Cir. 2/23/94), 632 So.2d 887, and *Plaisance*, 811 So.2d 1172

As noted in *Plaisance* 811 at 1193, "[t]he decision to grant or deny a motion for a recess is within the sound discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of discretion. *Hodges*, [749 So.2d 732]." Accordingly, we find that Defendant failed to show that the trial court abused its discretion in denying his motion for a recess.

## CONCLUSION

For these reasons, Defendant's conviction is affirmed.

**AFFIRMED.**

19