Judge, Regina Bartholomew Woods
Defendant/Appellant, Charles Williams ("Defendant"), appeals his jury trial conviction of aggravated rape in violation of La. R.S. 14:42. In this appeal, Defendant raises several assignments of error. Finding that the assignments lack merit, for the following reasons, we affirm Defendant's conviction and sentence.
STATEMENT OF THE CASE
On June 24, 2015, Defendant was charged by bill of indictment with aggravated rape of K.P.[1] in violation of La. R.S. 14:42.[2] The bill of indictment alleged that during 2012 to 2014, Defendant raped K.P., who was under the age of thirteen (13) during that time period.[3] On July 13, 2015, Defendant appeared for arraignment and pled not guilty.
On February 6, 2017, the State filed a motion in limine to exclude evidence of K.P.'s past sexual behavior pursuant to La. C.E. art. 412, as well as a motion in limine to limit the character impeachment testimony of K.P. On April 4, 2017, the jury was selected and sworn in. On the following day, outside the presence of the jury, the trial court heard the outstanding motions in limine and addressed Defendant's request to allow a Polaroid photograph of his penis to be admitted into evidence. The trial court granted the State's motions and ruled Defendant's photograph inadmissible.[4] The jury trial began on April 6, 2017, and on April 7, 2017, the jury returned a verdict finding Defendant guilty as charged.
On April 19, 2017, Defendant filed a motion for new trial. On April 25, 2017, the trial court denied the motion for new trial and, after Defendant waived sentencing *358 delays, sentenced Defendant to life imprisonment, without the benefit of parole, probation, or suspension of sentence.[5] On that same day, Defendant filed a motion for appeal, which the trial court granted and set June 24, 2017, as the return date. The record was lodged in this Court on June 28, 2017.
STATEMENT OF THE FACTS
On the first day of trial, Deputy Jay Bertheaud ("Dep. Bertheaud"), of the St. Bernard Sheriff's Office, testified that on June 17, 2014, he was dispatched to respond to a complaint of sexual assault of a juvenile.[6] According to Dep. Bertheaud, K.P. advised that over the course of four (4) years, she was sexually assaulted numerous times by Defendant, who is her stepfather. K.P. further alleged that Defendant penetrated her vagina with his penis. Thereafter, Dep. Bertheaud contacted Lieutenant Michelle Canepa ("Lt. Canepa") of the Juvenile Investigations Bureau to take over the investigation, which is protocol when there is a complaint of sexual assault of a juvenile. Dep. Bertheaud explained that K.P did not provide him with details regarding the sexual abuse or the exact number of times the assault occurred, and he did not request to search the house for physical evidence.
Next, Lt. Canepa of the Juvenile Investigations Bureau of the St. Bernard Parish Sheriff's Office,[7] testified that, as the on-call juvenile detective, she was assigned to the case, after being contacted by a patrol supervisor regarding sexual abuse by an "in-home perpetrator," and responded to the scene. Lt. Canepa testified that, because the alleged suspect was K.P.'s stepfather, she conducted a brief interview on June 17, 2014, at her office, away from the residence that K.P. shared with her mother and Defendant. During this interview, K.P. disclosed that Defendant had placed his penis inside of her vagina on several occasions. Once Lt. Canepa determined that the acts that K.P. described constituted the crime of aggravated rape, she concluded the interview and arranged for a forensic interview of K.P. through the Audrey Hepburn Care Center, also known as the New Orleans Children's Advocacy Center, at Children's Hospital in New Orleans, Louisiana.
The forensic interview took place the next morning on June 18, 2014. Lt. Canepa explained that K.P. was interviewed alone in a separate room. This interview was recorded and authorized law enforcement and/or Department of Children and Family Service ("DCFS") personnel were permitted to observe the interview from a closed-circuit television and submit questions through an earpiece worn by the forensic interviewer. After this initial interview, the forensic interviewer questioned K.P. again on July 15, 2014, under the same conditions. Lt. Canepa received two (2) DVDs containing the interviews conducted of K.P. and furnished them to the District Attorney's Office. She further stated that a medical examination of K.P. occurred subsequent to the forensic interviews.
*359 Lt. Canepa confirmed that during the forensic interview, K.P. provided details of the sexual abuse by Defendant. Lt. Canepa explained that she did not attempt to seize the clothing that K.P. had worn during the last incident of sexual abuse because K.P. indicated, during the forensic interview, that the clothing had been washed. Lt. Canepa admitted that she did not go to the bedrooms where the incidents of abuse allegedly occurred to seize bed sheets or look for stains on the flooring. Lt. Canepa did not seize Defendant's clothing or attempt DNA testing. She further testified that, during one of the incidents, K.P. indicated that she had bled, but no physical evidence was recovered to corroborate the bleeding. Lt. Canepa admitted that the medical examination did not show physical injuries or evidence of abuse. Lt. Canepa agreed that the medical records indicated that K.P. had a "normal hymen." Lt. Canepa stated that she believed that K.W. was present in the home when Defendant sexually abused K.P., but that she did not believe that K.W. was aware of the sexual abuse. Lt. Canepa stated that she was unaware of the specific dates and times the sexual incidents occurred.
Lt. Canepa further testified that she spoke with Defendant via telephone after K.P.'s first forensic interview and advised Defendant that he was under investigation; Defendant agreed to meet with Lt. Canepa, but never showed up. A warrant for Defendant's arrest was issued in August 2014. However, Defendant was not arrested until 2015. Lt. Canepa stated that she spoke with K.W. after K.P.'s forensic interview and advised her that an arrest warrant would be issued for Defendant.
Kate Holeman ("Holeman"), a forensic interviewer and systems coordinator at the New Orleans Children's Advocacy Center, was qualified as an expert forensic interviewer pursuant to article 511 of the Louisiana Children's Code. Holeman testified that she conducted two (2) forensic interviews of K.P., on June 18, 2014, and July 15, 2014, which were recorded on two DVDs.[8] Holeman explained that she interviewed K.P. in a "neutral space" and asked open, non-leading questions while law enforcement or DCFS personnel observed from a monitoring room. The recordings of Holeman's two forensic interviews of K.P. were played in open court for the jury.
In K.P.'s first forensic interview, recorded on June 18, 2014, she explained that her stepfather, Defendant, had been molesting her since she was in the fourth grade when she was either ten (10) or eleven (11) years of age. K.P. stated that Defendant threatened that, if she told anyone about the sexual abuse, he would kill her and her mother; K.P. further stated she was scared to tell her mother about the sexual abuse because she did not think that her mother would do anything. According to K.P., Defendant last sexually abused her approximately three (3) weeks prior to the interview, on a Monday evening. K.P. explained that she had not gone to school that day because she had been suspended and her mother prohibited her from watching television. At some point during that evening, Defendant entered K.P.'s bedroom and told K.P. that she could watch television because he had gotten her off punishment. Once K.P.'s mother had gotten into the shower, Defendant pushed K.P. down on the bed,[9] got on top of her, pulled down her clothes, pulled down his clothes, put his hand over her mouth, and inserted his penis into her vagina. K.P. stated he *360 pushed "harder and harder" and that she closed her eyes. She said Defendant "stayed on" her approximately five (5) minutes and stopped when he heard her mother emerge from the shower. K.P. stated she did not know what do to, her stomach hurt, and she felt scared and violated. K.P. stated that she showered and put her clothes in the washing machine after the incident.
K.P. explained that on other occasions, including the first incident of sexual abuse, Defendant had molested her in the bedroom he shared with her mother; during these incidents, K.P.'s mother was at work. According to K.P., during the first incident of sexual abuse, Defendant told her not to "scream or talk," pulled his pants half down, pulled her clothes to her knees, got on top of her, and placed his penis inside her vagina. K.P. said it hurt and that she felt scared, but did not know whether to scream, cry, or tell her mother. Afterward, K.P. said there was "something white and gooey on the bed" and Defendant wiped the bed. Defendant then told her to use the bathroom, but instructed her not to flush the toilet; Defendant then checked the toilet. K.P. locked herself in her room and did not emerge until a friend came over and asked if she wanted to play outside.
K.P. could not estimate the number of times Defendant had abused her, but stated that the sexual abuse usually occurred when her mother was at work. K.P. remembered seeing Defendant's penis, described it as "brownish-black" and said "it wasn't that long." When asked if there was anything different about Defendant's penis, K.P. responded that it appeared "normal."
In K.P.'s second forensic interview recorded on July 15, 2014, K.P. stated that she was worried about talking to Holeman because she was scared that people would treat her differently because of what happened; she worried that her relationship with her mother would change. Again, Holeman asked K.P. to discuss the first time Defendant raped her.[10] K.P. recalled that it occurred after she had taken twenty dollars ($20.00) from Defendant because she wanted go to the skating rink and her mother was at work. Defendant came into K.P.'s bedroom, yelled at her, and indicated that he would tell her mother about the money if K.P. did not have sex with him. Thereafter K.P. recalled the same factual scenarios that she stated in the first forensic interview, which occurred on June 18, 2014. She ended the interview by stating that she had last seen Defendant on Father's Day when she and her family went out to eat at a Chinese restaurant.[11]
Dr. Jamie Jackson ("Dr. Jackson") who was qualified as an expert in child abuse pediatrics pursuant to article 702 of the Louisiana Code of Evidence, testified that she worked at the Audrey Hepburn Care Center at Children's Hospital and treated K.P. in July 2014 when K.P. was referred there from the Emergency Room at Children's Hospital due to allegations of sexual abuse. Dr. Jackson explained that following an allegation of sexual abuse, she initially takes a basic medical and developmental history of the child, obtains an oral history of the child privately, then performs a full physical exam of the child. Dr. Jackson testified that the "talking part" is *361 the most important aspect in the diagnosis, because in the majority of sexual abuse cases there are no physical manifestations of abuse; further, the "talking part" informs the physician of which tests to perform.
Dr. Jackson testified that K.P. provided a history of sexual abuse by Defendant that included "penile/vaginal contact, digital/vaginal or hand/vaginal contact" and "squeezing" K.P.'s "breasts or chest area." In addition to obtaining K.P.'s history, Dr. Jackson observed K.P.'s demeanor, which was "very soft spoken and respectful." Dr. Jackson also discussed how "disclosures are processed" by young victims of sexual abuse. According to Dr. Jackson, young victims may disclose "a little bit" about incidents of sexual abuse and, as time goes on, "may say more;" disclosure depends on a number of factors. Dr. Jackson further testified that "even if asked directly, [young victims] may deny something initially until they are ready to talk about something."
Dr. Jackson stated that after K.P. provided a history of penile penetration by Defendant, she performed a physical medical examination of K.P. Upon being asked by the State, Dr. Jackson stated there is a "huge misconception" concerning physical virginity. She explained that most people believe that the hymen is a "lid" that covers the vaginal opening that must be punctured; however, the hymen is "really like a ring of tissue" near the opening of the vagina. Dr. Jackson further explained that it is "very rare," "extremely rare" to have an "imperforate hymen" and that females are generally born with openings in the hymen. In an effort to not perpetuate the misunderstanding of the hymen, Dr. Jackson does not make reference to "intact hymen" or "not intact hymen;" instead, when there is a ring of tissue in the vagina, she deems it a normal hymen. Dr. Jackson identified K.P.'s medical records; on a diagram of the vagina, she noted "normal hymen with intervaginal ridge around 5:00 to 6:00 o'clock," which is a normal variation.
Dr. Jackson testified that frequently there is no physical evidence of penetrative trauma, such as tears in the hymen tissue, due to the rate of healing inside the vagina; vaginal evidence of abuse can heal within twenty-four (24) to forty-eight (48) hours. She noted that "90 to 95 percent of the time" victims of sexual abuse have "normal exams." Therefore, even when there is vaginal-penile intercourse, Dr. Jackson would not expect to see trauma. Dr. Jackson testified that K.P.'s vaginal area and hymen appeared normal with no signs of tearing, bruising, or scarring to her vulva or injury inside her vagina. However, Dr. Jackson explained that penetration could have occurred despite the existence of a normal hymen.
Dr. Jackson further testified that, because K.P's examination took place six (6) weeks after the last incident of sexual abuse, sperm and DNA tests were not conducted; these findings are often not present even twenty-four (24) or forty-eight (48) hours after an incident of sexual abuse.
Dr. Jackson testified that K.P.'s medical records indicated white vaginal discharge that tested positive for bacterial vaginosis, which is a change in the normal vaginal flora. Bacterial vaginosis is not necessarily indicative of rape in a pre-pubescent girl because bacterial vaginosis could be caused by sexual intercourse, the use of feminine hygiene products, or the consumption of antibiotics. The medical records also indicated that K.P. had not yet begun to menstruate, but she had reported blood in her underwear after penile-vaginal penetration. Dr. Jackson testified that blood in underwear could indicate sexual *362 abuse, but could also be the result of irritation caused by a hygiene issue or a urinary infection. Dr. Jackson testified, however, considering that K.P. reported blood in her underwear and gave a history of penile penetration, that the blood, in her opinion, indicated sexual abuse.
Dr. Jackson confirmed that there are times when the perpetrator of abuse directs the child to wash away DNA evidence. She acknowledged that directing a child to urinate may indicate a perpetrator is attempting to get rid of evidence. Based on K.P.'s oral history and physical examination, despite the lack of physical findings of abuse, Dr. Jackson diagnosed K.P. with child sexual abuse.
Next, K.P.[12] testified and identified Defendant in open court. She stated that she now lives with her sister and has not seen her mother in several years as a result of her allegations of abuse against Defendant; her mother, K.W., remains married to Defendant.
K.P. testified that when Defendant began living with her family, her mother made her call him "dad;" K.P. only started referring to Defendant as a "stepdad" when she reported the abuse to the police. K.P. testified that Defendant began raping her when she was approximately ten (10) or eleven (11) years old and in fourth or fifth grade; she estimated that the sexual abuse by Defendant occurred from 2010 to 2013. However, K.P. first reported the sexual abuse to her mother and her aunt in June 2014. She explained that she did not disclose the sexual abuse to her friends at school because she was scared of Defendant due to his threats to kill her and her family if she told anyone. Although there was a period of time from 2009 to April 2011, when Defendant was absent from the home due to incarceration for another case, K.P. admitted that she did not report the sexual abuse at this time because she was scared and "you never know what a person is capable of." K.P. agreed that prior to the incidents of sexual abuse, Defendant had not made threats against her.
K.P. testified that the incidents of sexual abuse would typically occur in middle of the day or sometimes at night when her mother was not home and she was alone with Defendant; she estimated the sexual abuse occurred "sometimes daily or a couple of weeks." K.P. testified that during the incidents of sexual abuse, Defendant would get on top of her, penetrate her vagina with his penis, and move up and down until he stopped; the incidents typically lasted about ten (10) to fourteen (14) minutes. As a result, K.P. felt pain in her vagina.
K.P. recalled that the first incident of sexual abuse occurred in her mother's bedroom and Defendant laid her on the bed, told her "if [she] was to tell [her] mom or anyone, he would kill [her] and [her] family," then "took his penis out and just put it in [her] vagina." When questioned by the State, K.P. stated Defendant always used his penis and never used his fingers to penetrate her.[13] K.P. explained that, although she never saw Defendant's penis, she knew that Defendant used his penis to penetrate her because he would always pull down his pants. However, K.P. affirmed that she told the forensic interviewer that Defendant's penis was "normal" because she had never seen a penis before. She further explained that she described Defendant's penis as "blackish-brownish" because of the skin coloring on his face.
*363 K.P. also recalled reporting that, after one incident of sexual abuse, she had blood in her underwear because Defendant had "hurt" her. K.P. explained that she had shown the blood in her underwear to her mother who believed that the blood was a result of K.P.'s menstrual cycle; however, K.P. did not begin to menstruate until after she moved out of the home that she shared with her mother and Defendant. K.P. testified that she reported "white stuff that [she] saw on the sheet and [she] saw in [Defendant's] pants" to the Children's Advocacy Center, but was unsure if she reported it to the police. K.P. further stated that the police had not seized the bed sheets, her clothing, or her underwear.
K.P. explained that the sexual abuse "stopped when [she] got [sic] brought to the doctors and moved with the foster family." She testified that she remembered speaking with Dr. Jackson and that she was truthful in her statement. K.P. explained that the physical examination performed by Dr. Jackson was the first time her genitalia was examined by a physician. She stated that, in the past, she had been prescribed antibiotics for a cold.
At the conclusion of K.P.'s testimony, the State rested its case. In defense of the allegations, Defendant called his aunt, Gloria Singleton ("Ms. Singleton"), to testify on his behalf. Ms. Singleton explained that when Defendant was approximately one (1) or two (2) years old, while he was sitting on the floor eating, hot grits spilled on him and landed in his genital area, which caused scarring to his penis. Ms. Singleton conceded that she had not seen Defendant's penis since approximately 1971, and her knowledge of the coloration or scarring on Defendant's penis was limited to that time period.
K.W., K.P.'s mother, testified that she met Defendant in 2008, and they married in 2012.[14] K.W. stated that K.P. never feared Defendant and she had a good relationship with Defendant.
K.W. stated that she brought K.P. with her to work one day and K.P. told her that "Daddy," referring to Defendant, had been having sex with her. K.W. explained that she believed K.P. when she reported the sexual abuse and immediately called the police. K.W. testified that she later asked K.P. about the sexual abuse and K.P. stated that the sexual abuse occurred in K.W.'s bedroom and in her own bedroom and that the incidents happened "a lot."
K.W. testified that she was not in the room when the forensic interview took place, but was present when Dr. Jackson examined K.P. According to K.W., Dr. Jackson told her that her "child was perfectly normal. There was no sexual trauma to her vaginal area." K.W. testified that subsequent to the initial allegation of rape, K.P. had "chang[ed] her stories of what happened, where it took place and where [she] was at the time it took place" and that it was "just not adding up." K.W. testified that K.P. had lied to her in the past.
K.W. explained that she exclusively laundered K.P.'s clothes and never observed blood on K.P.'s underwear. K.W. confirmed that K.P. had not had a menstrual cycle while she lived with her. K.W. testified that K.P. had never disclosed the sexual abuse to anyone else. K.W. also stated that K.P. had not reported the sexual abuse while Defendant was incarcerated for another crime. K.W. stated that less than a week before K.P. reported the sexual abuse, K.P. had gotten into trouble at school and, for that, K.W. whipped her *364 and, for the first time, Defendant "corrected" K.P. According to K.W., K.P. complained that they were too strict, that she hated that house, and wanted to live with her older sister. After K.P. reported the sexual abuse, she was removed from K.W.'s custody and placed in foster care; eventually, K.W. relinquished her parental rights to her eldest daughter.
K.W. testified that Defendant's penis is discolored as a result of a burning incident when he was a child. She described that Defendant's penis had "a white blotchy patch of skin ... toward the tip of the head of this penis" and "some reddish pinkish scar tissue." K.W. said Defendant's scarring is between one to two inches long and that his penis is larger than average. K.W. stated that the scar is "very noticeable."
Defendant testified that he has five (5) convictions: car thefts in the 1980s and 1990s; offenses related to cocaine in 1993 and 2007, and a marijuana conviction in 2009. Defendant further testified that he served twenty-two (22) months in prison during 2009 to 2011 for both the 2007 cocaine conviction and the 2009 marijuana conviction.
Defendant confirmed Ms. Singleton's testimony that when he was child, his leg, penis, and genital area were burned by hot grits. Defendant explained that his leg healed, but as result of the accident, the "top portion" of his penis is "sometimes pink and white."
He testified that when K.P. would be punished, she would throw tantrums, "go into rages," break things, and express that she did not want to live with them anymore.
Defendant testified that after K.P.'s allegations in June 2014, he remained at their home for two (2) weeks, then moved in with his mother in Algiers. Defendant explained that he attempted to secure an apartment in Jefferson Parish, but was denied because his background check showed that he was classified as a sex offender, presumably as a consequence of K.P.'s allegations of sexual abuse. Defendant contacted Lt. Canepa regarding his alleged sex offender status. According to Defendant, Lt. Canepa denied that her office was responsible for his sex offender status. Defendant stated that Lt. Canepa requested that he come in for questioning related to K.P.'s allegations of sexual abuse. Defendant told Lt. Canepa that he would come in for questioning once he was able to afford an attorney. In August 2014, Lt. Canepa issued a warrant for his arrest, but Defendant was not arrested until May 2015. Defendant testified that police had never requested a DNA sample from him.
Defendant stated that he had sex with his wife, K.W., daily and most often in their shared bedroom. He conceded that he would expect sperm or ejaculate to be present on his bedroom sheets. Defendant denied K.P.'s allegation of sexual abuse.
DISCUSSION
Errors Patent
In accordance with La. C.Cr.P. art. 920, we have reviewed this appeal for errors patent; a review of the record for errors patent reveals none.[15]
Assignments of Error
In the original and supplemental appellate briefs filed, Defendant assigned the following errors:
1. Whether Defendant's right to present a defense and to confront his accuser was violated when the trial court refused to allow him to present a photograph of his penis, which *365 conflicted with the victim's verbal description.
2. Whether Defendant's right to present a defense and to confront his accuser was violated when the trial court prohibited Defendant from presenting evidence that K.P. had lied to the Office of Child Services.
3. Whether trial counsel was ineffective by permitting an expert to give an improper opinion regarding the truthfulness of K.P.
4. Whether Defendant's conviction violated due process because the two (2) videotaped recordings of K.P.'s forensic interview, which were shown to the jury during trial, were not transcribed.
5. Whether Defendant's conviction relies on "perjured testimony."
6. Whether the trial court erred in denying Defendant's motion for new trial.
Assignments of Error Numbers One (1) & Two (2)
Defendant's first two (2) assignments of error both pertain to whether his right to present a defense and to confront his accuser was violated by the trial court's refusal to allow him to present a photograph of his penis to contradict K.P.'s description of the same, as well as statements made to the Office of Child Services ("OCS") by K.P., subsequent to the crimes alleged herein.
This Court, in State v. Huckabay, stated:
An accused is entitled to confront and cross-examine the witnesses against him. La. Const. art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State's witnesses. State v. Van Winkle, [19] 94-0947, p. 5 (La. 6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, [19]96-0766 (La. 1/14/97), 688 So.2d 473 ; State v. Robinson, 99-2236, p. 6 (La. App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, [19]99-0023, pp. 18-19 (La. 1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, [19]96-2659, p. 24 (La. 10/19/99), 753 So.2d 801, 817.
2000-1082, pp. 25-26 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108.
La. C.E. art. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, La. C.E. art. 403 provides that even if evidence is relevant, the court may exclude that evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." However, "[a] trial court is vested with much discretion in determining whether the probative value of evidence is substantially outweighed by its prejudicial effect."
*366 State v. Washington , 1999-1111, p. 13 (La. App. 4 Cir. 3/21/01), 788 So.2d 477, 490.
During motions in limine argument, Defendant asserted that he should be allowed to introduce into evidence and publish to the jury a Polaroid photograph of his penis. Defendant stated that the photograph had been taken two-three weeks prior to trial; however, the morning of the first day of trial is when it was shown to the State, as well as the trial court. Defendant's face is not visible in the photograph; it only shows a waist of a person, covered by striped pants, a hand, and a penis, all of which presumably is the Defendant. Defendant argued that the photograph would be offered to impeach K.P.'s credibility if she testified at trial that she observed Defendant's penis, but did not identify certain distinct characteristics, such as the lighter pigmentation. The trial court ruled the photograph inadmissible and reasoned that the photograph did not evince any distinctive characteristics of Defendant's penis. Defendant objected to the trial court's ruling and proffered the photograph into evidence.
With regard to photographic evidence, the Louisiana Supreme Court has held the following:
[p]hotographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. See, e.g., State v. Magee, 11-0574 (La. 9/28/12), 103 So.3d 285, 323 ; State v. Lanieux, 09-675 (La. App. 5 Cir. 3/9/10), 39 So.3d 606, 609 ; State v. Lindsey, 404 So.2d 466, 475 (La.1981). A trial court's ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. Magee, 103 So.3d at 323 ; Lindsey, 404 So.2d at 475.
State v. Coleman , 2014-0402, pp. 32-33 (La. 2/26/16), 188 So.3d 174, 200-01, cert. denied, --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016).
Defendant argued that the trial court erred in ruling the photograph inadmissible because he has a constitutional right to present the photograph as impeachment evidence. Defendant asserted the photograph depicts a "pinkish-white discoloration" on his penis and that he was entitled to have the jury decide if the photograph was significantly inconsistent with K.P.'s description. Defendant argued that prohibiting him from introducing the photograph impeded his ability to challenge his accuser's testimony and bolster his own credibility.
We disagree. We find that the trial court did not abuse its wide discretion in disallowing the photograph to be introduced into evidence and published to the jury. Moreover, in addition to photographic evidence, Defendant called two witnesses who testified to the same subject matter that was allegedly shown on the photograph.
In particular, the jury heard testimony from Defendant's aunt, Ms. Singleton; K.P.'s mother and Defendant's wife, K.W.; and Defendant himself concerning the discoloration of Defendant's penis. All three (3) witnesses testified that Defendant sustained an injury to his genitals when he was a child that caused scarring and/or discoloration. Thus, Defendant was able to present evidence challenging K.P.'s description of Defendant's penis as normal and blackish brownish despite the absence of the photograph.
Even if the trial court committed error in excluding the photograph, Defendant had ample witness testimony to bolster his defense and the verdict reached by the jury was surely unattributable to any error on part of the trial court in excluding the photograph from evidence and any error *367 committed by the trial court was harmless. Finally, despite the disallowance of the photograph, the Defendant still had an opportunity to present a defense and confront and cross-examine K.P. regarding her description of his penis through the witness' testimony, as well as that of his own. Therefore, with regard to the exclusion of the photograph, we find that Defendant's first assignment of error lacks merit.
K.P.'s Statement to OCS
Prior to trial, the State filed a motion in limine seeking to exclude acts of K.P. when she lived with her aunt. The record reveals that, subsequent to K.P.'s sexual abuse allegation, she was placed by OCS with her aunt. According to Defendant, while living with her aunt, K.P. called OCS and claimed that her aunt had beaten her with a stick following an incident at school. OCS investigated K.P.'s claim and found no physical evidence of abuse; K.P. then admitted that she had "lied because she don't [sic] want to live with [her] aunt anymore." Defendant argued that the OCS incident showed K.P.'s motivation for lying and that she lashes out after being disciplined. Defense counsel further argued this incident undermined K.P.'s credibility and that Defendant had a right to present this as a defense. The trial court granted the State's motion in limine and prohibited Defendant from addressing the OCS investigation and untruthfulness of K.P.
The Louisiana Supreme Court opined that "relevancy and admissibility are discretion calls for the trial judge," which "should not be overturned absent a clear abuse of discretion." State v. Mosby , 595 So.2d 1135, 1139 (La.1992). Also,
Although La. C.E. art. 607(C) permits a party to attack the credibility of a witness by examining him concerning any matter having a reasonable tendency to disprove the truthfulness of his testimony, this grant is necessarily subject to the relevancy balance of La. C.E. art. 403 and to the limitation set forth in La. C.E. art. 608(B), generally precluding inquiry into particular acts, vices or courses of conduct to attack character for truthfulness.
State v. Tauzin , 38,436, p. 12 (La. App. 2 Cir. 8/18/04), 880 So.2d 157, 164 ; State v. Meshell, 567 So.2d 1181 (La. App. 3d Cir.1990).
In this case, Defendant sought to introduce a particular act of K.P., i.e., her untruthfulness in reporting an incident to OCS, instead of her general reputation with regard to truthfulness or untruthfulness. As developed through jurisprudential rules, and codified in the Louisiana Code of Evidence, particular acts of a witness may not be inquired into for the purpose of attacking the witness' truthfulness, which is precisely what Defendant wanted the trial court to do. As such, we find that the trial court, in weighing the evidence, reached the correct decision and properly disallowed the OCS investigation that occurred subsequent to the acts alleged herein, as well as the untruths told by K.P. to OCS regarding her aunt. Not only does it amount to a particular act, it is not even remotely relevant to the sexual abuse allegations that Defendant is accused of in the instant matter.
Thus, we find that Defendant's second assignment of error lacks merit.
Assignment of Error Number Three (3)
In his third assignment of error, Defendant argued that his defense counsel was ineffective by allowing Dr. Jackson to give an "ultimate opinion, in the form of 'diagnosis' that K.P. was truthful, and that, by necessity, Defendant is guilty."
*368 This Court, in State v. Quezada , set forth the standard for reviewing claims of ineffective assistance of counsel as follows:
"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." State v. Howard , [19]98-0064, p. 15 (La. 4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes , [19]98-0086, p. 7 (La. App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; State v. Brooks , [19]94-2438, p. 6 (La. 10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson , [19]98-1606, p. 10 (La. App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra ; State v. Jackson , [19]97-2220, p. 8 (La. App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland , 466 U.S. at 686, 104 S.Ct. at 2064 ; State v. Ash , p. 9 (La. App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland , 466 U.S. at 693, 104 S.Ct. at 2068 ; State v. Guy , [19]97-1387, p. 7 (La. App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
This court has previously recognized that if an alleged error falls "within the ambit of trial strategy" it
does not "establish ineffective assistance of counsel." Bordes , [19]98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy , 483 So.2d 1105, 1107 (La. App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." Id. quoting State v. Brooks , 505 So.2d 714, 724 (La. 1987).
State v. Quezada , 2013-1318, pp. 10-11 (La. App. 4 Cir. 5/21/14), 141 So.3d 906, 914-15. (quoting State v. Rubens , 2010-1114, pp. 58-59 (La. App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67 ).
The record before us does not have sufficient evidence to determine whether trial counsel provided Defendant with effective assistance of counsel. In order to prove ineffective assistance of counsel, Defendant must first show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, Defendant must prove that he was prejudiced by counsel's deficient performance. See State v. Paulson , 2015-0454, p. 11 (La. App. 4 Cir. 9/30/15), 177 So.3d 360, 368.
With regard to the present claim, the record is void of sufficient information for this court to make a determination whether effective or ineffective assistance of counsel was rendered to Defendant; therefore, we pretermit determination of this assignment of error and allow Defendant *369 to raise it more properly in an application for post-conviction relief.
Assignments of Error Numbers Four (4) & Five (5)
In Defendant's assignments of error numbers four (4) and five (5) he argues that his conviction violated due process because the trial record is incomplete and his conviction was based upon perjured testimony.
Video Recordings of K.P.'s Forensic Interviews
Defendant first asserts that his due process rights were violated when the court reporter failed to transcribe the two forensic interviews conducted of K.P. at the Child Advocacy Center; therefore, making his trial record incomplete.
The Louisiana Constitution article I, § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." "A criminal defendant has a right to a complete transcript of his trial proceedings." State v. Plaisance, 00-1858, p. 17 (La. App. 4 Cir. 3/6/02), 811 So.2d 1172, 1186. Additionally, La. C.Cr.P. art. 843 provides, in pertinent part, that "[i]n felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel." State v. Draughn , 2005-1825, p. 63 (La. 1/17/07), 950 So.2d 583, 625. "The lack or omission of material portions of the transcript may require reversal where the appellate court finds that the defendant is denied full review of 'a substantial portion of the trial record for errors.' " State v. Porter , 2013-0357, p. 16 (La. App. 4 Cir. 10/8/14), 151 So.3d 871, 883 (citing State v. Landry, 1997-0499, p. 2 (La. 06/29/99), 751 So.2d 214, 215 ). "[T]his court has held that 'an incomplete record may nonetheless be adequate for appellate review' and 'a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts.' " Porter, 2013-0357, p. 16, 151 So.3d at 883 (quoting Plaisance , 2000-1858, pp. 17-18, 811 So.2d at 1187 ).
Defendant argues that the record is incomplete because the two (2) video recordings of K.P.'s forensic interview were not transcribed.[16] However, the video recordings themselves were introduced and submitted into evidence and were played, in their entirety, for the jury. Further, the video recordings were made available for review on appeal and serve as the best evidence of their content, as opposed to a transcription. Thus, based on the foregoing, Defendant cannot establish that he was prejudiced by the failure of the court reporter to transcribe the videotapes of K.P. Accordingly, this assignment of error lacks error.
Perjured Testimony
With regard to the alleged perjured testimony of K.P., Defendant claims that the State failed to correct K.P.'s statement at trial that she was raped by Defendant on a daily basis. Conversely, in the videotaped recordings of K.P., she only discussed two incidents and indicated that there were "at most five incidents." Defendant argues K.P.'s false testimony contributed to the verdict and violates his right to due process.
*370 The Louisiana Supreme Court, in State v. Reed , stated:
As a general matter, if a prosecutor allows a State witness to give false testimony without correction, a
reviewing court must reverse the conviction gained as a result of that perjured testimony, even though the testimony goes only to the credibility of the witness. Napue v. Illinois , 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ; State v. Williams , 338 So.2d 672, 677 (La. 1976). Even if the State does not solicit the false testimony, its failure to correct it "when it appears" violates due process guarantees. Napue , 360 U.S. at 269, 79 S.Ct. at 1177 ; State v. Ellender , 354 So.2d 500, 503 (La. 1978). When such false testimony goes before the jury, the defendant must receive a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States , 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) ; State ex rel. Shilling v. Whitley , 92-3312 (La. 4/29/94), 637 So.2d 459.
2014-1980, p. 41 (La. 9/7/16), 200 So.3d 291, 321, reh'g granted in part , 2014-1980 (La. 10/19/16), 213 So.3d 384, and cert. denied , --- U.S. ----, 137 S.Ct. 787, 197 L.Ed.2d 258 (2017), reh'g denied , --- U.S. ----, 137 S.Ct. 1615, 197 L.Ed.2d 738 (2017).
Here, review of the video recordings and the trial transcript does not indicate that the State suborned perjured testimony. While K.P. does describe only a few incidents of rape in the videotaped recordings, she also estimated that Defendant "got on top of her" about every other week. At trial, K.P. stated that Defendant raped her every other week or sometimes daily.
This Court, in State v. Doleman , rejected the defendant's Napue claim that the prosecutor allowed a State witness to give false testimony without correction, stating:
The mere fact that witnesses testified differently at different proceedings does not prove that they testified falsely. At best, such conflicting testimony indicates that they may have recalled things differently at a 1995 proceeding than they did at a trial six years later. Furthermore, it cannot be presumed that prosecutor has knowledge that a witness's answer is false simply
because the witness may have testified somewhat differently at a prior proceeding.
2002-0957, p. 18 (La. App. 4 Cir. 12/4/02), 835 So.2d 850, 862.
Here, K.P.'s forensic interviews were conducted in June and July 2014; however, trial did not commence until approximately three (3) years later, in April 2017. At trial, Defendant questioned K.P. concerning the discrepancies between the forensic interview and the trial testimony. The fact that K.P. provided arguably inconsistent testimony does not establish that K.P. testified falsely or that the State knew it was false. Based on the aforementioned, the discrepancy regarding the frequency of the sexual abuse did not deny Defendant a fair trial and did not amount to a violation of Defendant's due process rights. Therefore, we find Defendant's assignment of error lacks merit.
Assignment of Error Number Six (6)
In his sixth assignment of error, Defendant argues that the trial court erred in denying his motion for new trial.
La. C.Cr.P. art. 851 provides the grounds for a new trial, and states, in pertinent part:
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the *371 motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
(1) The verdict is contrary to the law and the evidence.
***
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although
the defendant may not be entitled to a new trial as a matter of strict legal right.
La. C.Cr.P. art. 858 further provides that "[n]either the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law." This Court, in State v. Chambers , has stated that "[t]he trial judge has much discretion in ruling on a motion for a new trial and, upon review, an appellate court may only set aside the judgment upon a finding that the trial judge exercised his discretion in an arbitrary manner." 2016-0712, p. 12 (La. App. 4 Cir. 2/15/17), 212 So.3d 643, 650.
After the trial concluded, Defendant filed a motion for new trial asserting that the verdict was contrary to the law and the evidence and that the ends of justice would be served by granting a new trial. On April 25, 2017, the trial court denied Defendant's motion and stated:
The arguments that were just made by the defendant were made in court to the jury, and the jury after deliberating made their decision. And there's nothing new that you're presenting here today that wasn't presented to the jury. So, they made their decision and the court's going to stick with that decision. The motion is overruled and denied.
Defendant argued that the trial court should have granted a new trial because there is a lack of evidence corroborating K.P.'s allegations and because K.P.'s testimony was inconsistent and failed to provide detail regarding the incidents of sexual abuse. Defendant also argued the trial court's rulings, which prohibited defense counsel from presenting the photograph of his penis and from introducing evidence of K.P.'s untruthfulness to OCS, denied him due process and thereby warranted a new trial.
The Louisiana Supreme Court, in State v. Guillory, contemplated whether a trial court erred in granting or denying a motion for new trial based solely on La. C.Cr.P. art. 851(5) and determined that two (2) "precepts" must be considered:
One, in this provision the trial court is vested with almost unlimited discretion and its decision should not be interfered with unless there has been a palpable abuse of that discretion. State v. Bolivar, 224 La. 1037, 71 So.2d 559, 560 (1954). Two, "[t]he motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." La. Code Crim. Proc. art. 851 ; [State v. ] West, [172 La. 344,] 134 So. [243] at 244 [ (1931) ].
2010-1231, pp. 4-5 (La. 10/8/10), 45 So.3d 612, 615-16.
In the present case, the trial court did not err in denying the Defendant's motion for new trial pursuant to La. C.Cr.P. art. 851(1) or 851(5). Aggravated rape is "a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed *** (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense." La. R.S. 14:42(A)(4). K.P. testified that when she *372 was between the ages of nine (9) and eleven (11), Defendant forced himself upon her and used his penis to penetrate her vagina on several occasions. In addition to her testimony, the State presented two videotaped forensic interviews conducted of K.P., as well as the expert testimony of Dr. Jackson who opined that K.P. had been sexually abused.
Accordingly, there was sufficient evidence for the jury to find Defendant guilty of aggravated rape; thus, the verdict was neither contrary to the law or the evidence and the verdict did not fall short of serving the ends of justice.
Furthermore, Defendant has not shown an error of law, injustice, or that an abuse of discretion was committed and therefore has not established the ends of justice would be served in granting a new trial. Therefore, we find that Defendant's sixth and final assignment of error lacks merit.
DECREE
For the aforementioned reasons, we affirm the Defendant's conviction and sentence.
AFFIRMED

The victim, K.P., and her mother, K.W., will be referred to by their initials to protect the identity of the victim. La. R.S. 46:1844(W) prohibits the public disclosure of the names, addresses, or identities of crime victims under the age of eighteen (18) and of all victims of sex offenses, but instead authorizes the use of initials and abbreviations. In the "interest of protecting minor victims and victims of sexual offenses," victims and defendants or witnesses whose names can reveal the victims' identities are referred to only by initials. State v. Ross , 2014-84, p. 3, n. 3 (La. App. 5 Cir. 10/15/14), 182 So.3d 983, 985.

In 2015, subsequent to the commission of the offense charged, the Louisiana legislature renamed the crime of aggravated rape to first degree rape.

At the time of the alleged offense, Defendant was married to K.P.'s mother, K.W.

The photograph of Defendant's penis was proffered into evidence.

The trial court instructed Defendant that if he were, for any reason, released, the law provides that he must register as a sex offender where he lives and that his failure to register could result in imprisonment.

To protect the privacy of the victim, we have omitted the address where Dep. Bertheaud was dispatched.

According to Lt. Canepa, the Juvenile Investigations Bureau investigates physical and sexual abuse involving minors. In her role, Lt. Canepa is tasked with collecting physical evidence through the course of the investigation of cases.

Holeman has been a forensic interviewer since June 2014 and K.P. was the first child she had interviewed.

K.P. was sitting on the bed before Defendant pushed her down.

The first incident occurred in the afternoon in the apartment in which they resided.

K.P. also indicated in the video that she believed Defendant had also "done it" to the young daughter of Defendant's cousin. She stated that Defendant inappropriately touched his cousin's daughter at a party and that the daughter had told her parents. K.P. indicated that that family moved away.

K.P. was sixteen (16) years old at the time of trial.

In the second forensic interview, K.P. stated that Defendant did, in fact, use his fingers to touch her "down there."

At the time of trial, K.W. was still married to Defendant.

State v. Anderson , 2008-962, p. 2 (La. App. 3 Cir. 2/4/09), 2 So.3d 622, 624.

At trial, counsel for defense agreed with the prosecution that the court reporter did not need to transcribe the forensic interviews.